## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

| | |
|---|---|
| AMERICAN HEALTH CARE ASSOCIATION<br>1201 L Street, NW<br>Washington, DC 20005,<br><br>MISSISSIPPI HEALTH CARE ASSOCIATION<br>303 Brame Road<br>Ridgeland, MS 39157,<br><br>GREAT OAKS REHABILITATION AND<br>HEALTHCARE CENTER, LLC d/b/a GREAT<br>OAKS REHABILITATION AND<br>HEALTHCARE CENTER<br>111 Chase Street<br>Byhalia, MS 38611,<br><br>COMMUNITY CARE OF VICKSBURG LLC<br>d/b/a HERITAGE HOUSE NURSING CENTER<br>3103 Wisconsin Avenue<br>Vicksburg, MS 39180, and<br><br>MANSFIELD LONG TERM CARE, LLC d/b/a<br>THE PAVILION AT CREEKWOOD<br>2100 Cannon Drive<br>Mansfield, TX 76063,<br><br>        Plaintiffs,<br><br>   v.<br><br>SYLVIA MATHEWS BURWELL<br>*In her official capacity as*<br>*Secretary of Health and Human Services*<br>200 Independence Avenue, SW<br>Washington, DC 20201,<br><br>ANDREW M. SLAVITT<br>*In his official capacity as*<br>*Acting Administrator of the Centers for Medicare*<br>*and Medicaid Services*<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>        Defendants. | Case No. 3:16 CV 233-MPM-RP |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW Plaintiffs American Health Care Association; Mississippi Health Care Association; Great Oaks Rehabilitation and Healthcare Center, LLC d/b/a Great Oaks Rehabilitation and Healthcare Center; Community Care of Vicksburg LLC d/b/a Heritage House Nursing Center; and Mansfield Long Term Care, LLC d/b/a The Pavilion at Creekwood (collectively, "Plaintiffs"), which bring this action against Defendant Sylvia Mathews Burwell in her official capacity as Secretary of Health and Human Services (the "Secretary") and Defendant Andrew M. Slavitt in his official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services (the "Acting Administrator"), alleging as follows:

### PRELIMINARY STATEMENT

1. Plaintiffs have filed this action to enforce their rights under federal law, including the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, to enter into arbitration agreements. The Centers for Medicare & Medicaid Services ("CMS") within the Department of Health and Human Services ("HHS") recently promulgated a rule purporting to prohibit Medicare-participating skilled nursing facilities ("SNFs") and Medicaid-participating nursing facilities ("NFs") from entering into pre-dispute arbitration agreements with residents at their facilities, no matter how fair or beneficial those agreements may be to residents. *See* Ex. 1 (Medicare and Medicaid Programs; Reform of Requirements for Long-Term Care Facilities; Arbitration Rule, 81 Fed. Reg. 68,688 (October 4, 2016) ("the Arbitration Rule")).

2. As explained in detail below, that arbitration ban violates the FAA and exceeds CMS's and HHS's statutory authority under the Medicare and Medicaid Acts, neither of which vests the agencies with the power to regulate alternative dispute resolution procedures. Moreover, even if such a ban were legally permissible, the Arbitration Rule is arbitrary and capricious—and thus unlawful—because it will needlessly deprive both SNFs/NFs and their residents

of the benefits of arbitration and result in the siphoning of resources toward litigation costs and away from resident care; and because CMS and HHS reversed their prior guidance permitting pre-dispute arbitration agreements without justifying the change in position. Accordingly, plaintiffs respectfully request entry of a declaratory judgment that the Arbitration Rule is unlawful and entry of orders preliminarily and permanently enjoining the Secretary and the Acting Administrator from enforcing the Arbitration Rule when it is scheduled to take effect on November 28, 2016.

3.      For residents and their families, arbitration is an equally fair—yet far simpler and less costly—means of seeking redress as compared to the complicated and slow-moving court system. Arbitration also lowers SNFs/NFs' costs of resolving disputes, which creates savings that those facilities can pass on to their residents. But these benefits can be realized only when parties are free to enter into arbitration agreements *before* disputes arise. Despite arbitration's overall systemic benefits, parties almost never agree to arbitration in a particular case after a dispute has arisen—because lawyers are more comfortable in the court system, where cases take longer to resolve and legal fees typically are higher, they virtually always convince their clients to litigate in court. Long-term care facilities and their residents and residents' families should not be deprived of the ability to choose arbitration, a valuable form of dispute resolution.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the parties to and subject matter of this action under 28 U.S.C. § 1331 because plaintiffs' claims arise under a federal statute—the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

5.      Alternatively, if the Court determines that any legal claims asserted here arise under the Medicare Act within the meaning of 42 U.S.C. §§ 405(h) and 1395ii, the Court has subject-matter jurisdiction over those claims under 42 U.S.C. § 405(g) because they have been

- 3 -

presented to the Secretary and because exhaustion of administrative remedies following enforcement of the arbitration ban would be futile.

6.      Alternatively, the All Writs Act, 28 U.S.C. § 1651, grants this Court authority to enter preliminary relief to preserve the status quo pending its review of the merits of plaintiffs' claims.

7.      Venue lies in this judicial district under 28 U.S.C. § 1391(e) because this is a civil action against officers of the United States acting in their official capacity, at least one plaintiff resides in this district, and no real property is involved in the action.

## PARTIES

8.      Plaintiff American Health Care Association ("AHCA") is a not-for-profit federation of affiliate state health organizations, together representing more than 13,000 non-profit and for-profit nursing, subacute care, and assisted-living providers caring for more than 1.6 million individuals each day. Many of those providers are classified as SNFs and/or NFs, making them subject to the Arbitration Rule. AHCA's business address and headquarters is 1201 L Street, NW, Washington, District of Columbia 20005.

9.      Plaintiff Mississippi Health Care Association ("MHCA") is a trade association of nursing homes, personal care/assisted living homes, and Intermediate Care Facilities for the Intellectually Disabled and is the Mississippi affiliate of AHCA. MHCA's members care for roughly 17,000 residents across the state. MHCA's business address is 303 Brame Road, Ridgeland, Mississippi 39157.

10.      AHCA and MHCA have standing to pursue this action on behalf of their respective members under the three-element test enunciated in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) AHCA's and MHCA's members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are

germane to AHCA's and MHCA's organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of individual members.

11.     Plaintiff Great Oaks Rehabilitation and Healthcare Center, LLC d/b/a Great Oaks Rehabilitation and Healthcare Center ("Great Oaks") operates a 60-bed Medicare- and Medicaid-participating SNF/NF, located at 111 Chase Street, Byhalia, Mississippi 38611. It has been rated by CMS as a composite five-star facility, the top CMS rating for long-term care facilities. It regularly enters into pre-dispute arbitration agreements with its residents upon admission, and its policy is to use arbitration to resolve disputes with residents.

12.     Plaintiff Community Care of Vicksburg LLC d/b/a Heritage House Nursing Center ("Heritage House") operates a 60-bed Medicare- and Medicaid-participating SNF/NF, located at 3103 Wisconsin Avenue, Vicksburg, Mississippi 39180. It has been rated by CMS as a composite five-star facility. It regularly enters into pre-dispute arbitration agreements with its residents upon admission, and its policy is to use arbitration to resolve disputes with residents.

13.     Plaintiff Mansfield Long Term Care, LLC d/b/a The Pavilion at Creekwood ("The Pavilion") is a 126-bed Medicare- and Medicaid-participating SNF/NF, located at 2100 Cannon Drive, Mansfield, Texas 76063. Because The Pavilion just opened in July 2015, it has not yet been assigned an overall star rating by CMS. The Pavilion regularly presents pre-dispute arbitration agreements to its residents upon admission, and while the facility has not yet had a dispute that necessitated arbitration, it intends to use arbitration to resolve disputes with residents if such disputes arise.

14.     Plaintiffs Great Oaks, Heritage House, and The Pavilion will be referred to collectively as the "Provider Plaintiffs."

15.     Defendant Sylvia Mathews Burwell is the Secretary of Health and Human Services. Congress has assigned to the Secretary statutory responsibilities relevant to this case.

- 5 -

Although the Secretary has delegated many of those responsibilities to CMS, the Secretary retains legal responsibility for the Arbitration Rule, which she formally approved. The Secretary's business address is 200 Independence Avenue, SW, Washington, District of Columbia 20201. The Secretary is sued in her official capacity only.

16. Defendant Andrew M. Slavitt is the Acting Administrator for the Centers for Medicare and Medicaid Services. CMS is the agency that officially promulgated the Arbitration Rule. The Acting Administrator's business address is 7500 Security Boulevard, Baltimore, Maryland 21244. The Acting Administrator is sued in his official capacity only.

## BACKGROUND AND FACTUAL ALLEGATIONS

### The Federal Arbitration Act and Congress's Repeated Refusal to Invalidate Arbitration Agreements Between SNFs/NFs and Their Residents

17. As the U.S. Supreme Court has reiterated, the Federal Arbitration Act ("FAA") "reflects an emphatic federal policy in favor of arbitral dispute resolution." *Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (per curiam) (quoting *KPMG LLP v. Cocchi*, 132 S. Ct. 23, 25 (2011) (per curiam)) (in turn quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

18. Specifically, Section 2 of the FAA states that a "written provision in * * * a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Thus, if an arbitration agreement is the product of "fraud" or is "unconscionab[le]"—which are well-recognized grounds for invalidating "'contracts generally'"—Section 2 permits courts to "invalidate" the agreement. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (quoting *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987)). Otherwise, Section 2 directs that "arbitration agreements" be "'rigorously enforce[d]' * * * according to their terms." *Am. Express*

*Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

19.     Consistent with the longstanding presumption against implied repeals of statutes (*Morton v. Mancari*, 417 U.S. 535, 551 (1974)), the Supreme Court has explained that the FAA's mandate that arbitration agreements be "enforce[d] * * * according to their terms" can be displaced only by a "'contrary congressional command'" in another federal statute. *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). If another statute is "silent" on the question of arbitration, the FAA generally controls. *Id.* at 673.

20.     For that reason, when Congress wishes to vest federal agencies with the authority to regulate or prohibit the use of arbitration agreements in certain industries, Congress has used unambiguous statutory language to confer that authority. For example, Section 1028 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that, if certain conditions are met, the Consumer Financial Protection Bureau "may prohibit or impose conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer financial product or service providing for arbitration of any future dispute between the parties[.]" 12 U.S.C. § 5518(b); *see also, e.g.*, 15 U.S.C. § 78o(o) (authorizing the Securities and Exchange Commission to, "by rule, * * * prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising under the Federal securities laws"); Department of Defense Appropriations Act, 2010, Pub. L. No. 111-118, § 8116(a), 123 Stat. 3409, 3454-55 (2009) (prohibiting expenditure of appropriated funds unless certain government contractors and subcontractors agree not to use or enforce particular arbitration agreements).

21. By contrast, Congress has not granted the Secretary or Acting Administrator the authority to regulate the use of arbitration. Neither the Medicare Act nor the Medicaid Act says anything at all about arbitration agreements or alternative dispute resolution—let alone authorizes HHS or CMS to prohibit use of those agreements entirely.

22. In fact, Congress has repeatedly rejected legislation that would have amended the FAA to invalidate arbitration agreements between SNFs/NFs and their residents.

23. For example, in 2008, the House of Representatives considered the Fairness in Nursing Home Arbitration Act of 2008, H.R. 6126, 110th Cong. That proposed legislation would have amended the FAA to expressly provide that pre-dispute arbitration agreements between SNFs/NFs and their residents "shall not be valid or specifically enforceable." *Id.* § 2(a). House Bill 6126 received a formal committee hearing, *see Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. on Commercial & Admin. Law of the House Comm. on the Judiciary*, 110th Cong. (2008), and was reported out of committee with dissenting views, *see* H.R. Rep. No. 110-894 (2008). However, the bill failed to obtain a vote by the full House of Representatives or the Senate.

24. Notably, the then-Secretary of HHS, Michael O. Leavitt, formally opposed House Bill 6126. *See* H.R. Rep. No. 110-894, at 13-15 (reproducing Letter from Michael O. Leavitt, Sec'y of Health & Human Servs., to House Comm. on the Judiciary (July 29, 2008)). Secretary Leavitt explained that pre-dispute arbitration agreements between SNFs/NFs and their residents "do not hinder the Administration's ability to take enforcement action against nursing homes providing poor quality care." *Id.* at 13. Secretary Leavitt further explained that "[f]or the past eighty years, the federal government has consistently found that arbitration may be a favorable method of resolving disputes and, in some instances, may be preferable to litigation. In enacting

the [FAA] in 1925, Congress stated a clear preference for arbitration in resolving controversies arising out of contracts or transactions involving interstate commerce." *Id.*

25. The same year, the Senate considered the Fairness in Nursing Home Arbitration Act, S. 2838, 110th Cong. (2008). Like House Bill 6126, Senate Bill 2838 would have amended the FAA to expressly provide that pre-dispute arbitration agreements between SNFs/NFs and their residents "shall not be valid or specifically enforceable." *Id.* § 3(4). Senate Bill 2838 also received a formal hearing, *see S. 2838, the Fairness in Nursing Home Arbitration Act: Joint Hearing Before the Subcomm. on Antitrust, Competition Policy and Consumer Rights of the Senate Comm. on the Judiciary, and the Senate Spec. Comm. on Aging*, 110th Cong. (2008), and was reported out of committee with dissenting views, *see* S. Rep. No. 110-518 (2008). However, Senate Bill 2838 failed to obtain a vote by the full Senate or the House of Representatives.

26. Nearly identical bills were introduced, considered, and rejected in subsequent Congresses. *See* Fairness in Nursing Home Arbitration Act of 2009, H.R. 1237, 111th Cong. § 2(a) (proposing to amend the FAA to expressly provide that pre-dispute arbitration agreements between SNFs/NFs and their residents "shall not be valid or specifically enforceable"); Fairness in Nursing Home Arbitration Act, S. 512, 111th Cong. § 3(4) (2009) (same); Fairness in Nursing Home Arbitration Act of 2012, H.R. 6351, 112th Cong. § 2(a) (same).

27. In short, Congress has thoroughly—and repeatedly—considered whether to regulate or prohibit the use of arbitration agreements between SNFs/NFs and their residents, and each time, Congress has rejected the proposal. Yet the Secretary and the Acting Administrator have enacted an Arbitration Rule imposing the very proposed ban on arbitration agreements that Congress has consistently refused to enact.

**Medicare and Medicaid Acts**

28. The Medicare Act, 42 U.S.C. §§ 1395 to 1395*lll*, establishes a federal insurance program that pays for medical care provided to elderly and disabled individuals in SNFs. For example, the Medicare Act covers post-hospitalization therapy provided in a SNF for up to 100 days during an individual's "spell of illness." 42 U.S.C. § 1395d(a)(2)(A).

29. The Medicaid Act, 42 U.S.C. §§ 1396 to 1396w-5, establishes a cooperative federal-state program for providing medical care to needy individuals. To qualify for federal funds, States must submit a state plan to the Secretary detailing the nature and scope of the State's Medicaid program. 42 U.S.C. § 1396a. A state Medicaid plan must cover NF services. *Id.* §§ 1396a(a)(10)(A), 1396d(a)(4)(A).

30. The Medicare and Medicaid Acts impose similar requirements on SNFs and NFs, and define the two provider categories in nearly identical terms. The Medicare Act defines a "skilled nursing facility" as an institution that, among other things, "is primarily engaged in providing to residents * * * skilled nursing care and related services for residents who require medical or nursing care, or * * * rehabilitation services for the rehabilitation of injured, disabled, or sick persons * * * ." 42 U.S.C. § 1395i-3(a)(1). The Medicaid Act uses identical language in defining a "nursing facility," while adding that such an institution may also be primarily engaged in providing "health-related care and services to individuals who because of their mental or physical condition require care and services (above the level of room and board) which can be made available to them only through institutional facilities[.]" *Id.* § 1396r(a)(1)(C).

31. The Medicare and Medicaid Acts impose several categories of requirements on SNFs and NFs, including requirements related to the provision of services, 42 U.S.C. §§ 1395i-3(b) (SNFs), 1396r(b) (NFs), as well as resident rights, *id.* §§ 1395i-3(c) (SNFs), 1396r(c) (NFs). The Medicare and Medicaid Acts also impose similar requirements on SNFs and NFs "relating to

administration and other matters[.]" *Id.* §§ 1395i-3(d) (SNFs), 1396r(d) (NFs). For example, a SNF or NF must be "administered in a manner that enables it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident[.]" *Id.* §§ 1395i-3(d)(1)(A) (SNFs), 1396r(d)(1)(A) (NFs). Administrative requirements are also imposed on SNFs/NFs with respect to facility administrators, *id.* §§ 1395i-3(d)(1)(C) (SNFs), 1396r(d)(1)(C) (NFs); licensure, *id.* §§ 1395i-3(d)(2) (SNFs), 1396r(d)(2) (NFs); sanitation and infection control, *id.* §§ 1395i-3(d)(3) (SNFs), 1396r(d)(3) (NFs); and compliance with applicable federal, state, and local laws, *id.* §§ 1395i-3(d)(4)(A) (SNFs), 1396r(d)(4)(A) (NFs).

32. The statutory provisions of critical importance to this case are located at the end of the list of administrative requirements imposed on SNFs/NFs. In relevant part, the Medicare Act provides that a SNF "must meet such other requirements relating to the health, safety, and well-being of residents * * * as the Secretary may find necessary." 42 U.S.C. § 1395i-3(d)(4)(B). The Medicaid Act uses nearly identical language, specifying that NFs "must meet such other requirements relating to the health and safety of residents * * * as the Secretary may find necessary." *Id.* § 1396r(d)(4)(B).

33. CMS, in turn, has promulgated a single set of regulations known as the "Requirements for Long Term Care Facilities" ("LTC Requirements"), which are found in 42 C.F.R. part 483, subpart B. SNFs and NFs must comply with the LTC Requirements with respect to all residents, not just those who are Medicare and/or Medicaid beneficiaries. CMS first promulgated the LTC Requirements in 1989, when the agency was known as the Health Care Financing Administration. *See* Medicare and Medicaid; Requirements for Long Term Care Facilities; Arbitration Rule, 54 Fed. Reg. 5316 (Feb. 2, 1989). For more than 27 years, until the Arbitration

Rule challenged here was promulgated in October 2016, the LTC Requirements were silent with respect to the use of arbitration agreements.

34.     The Medicare and Medicaid Acts provide that determinations of compliance with the LTC Requirements (among other requirements) will be made using onsite inspections known as "surveys." 42 U.S.C. §§ 1395i-3(g) (SNFs), 1396r(g)(2) (NFs). If a facility is found not to be in compliance with Medicare and/or Medicaid requirements, the Secretary has discretion to impose a variety of sanctions and remedies, including termination of the facility's participation in the Medicare and Medicaid programs, denial of payment, placement of a temporary manager in the facility, and imposition of civil money penalties up to $20,628 per incident for each day that a violation existed. *Id.* §§ 1395i-3(h)(2) (SNFs), 1396r(h)(2) (NFs).

### The Pelovitz Memorandum

35.     In 2003, CMS issued a nationwide memorandum to federal and state officials involved in the regulatory oversight of SNFs/NFs. *See* Ex. 2 (Mem. from Steven A. Pelovitz, Dir., Survey & Certification Grp., Ctrs. for Medicare & Medicaid Servs., to Survey & Certification Grp. Reg'l Office Mgmt., *et al.* (Jan. 9, 2003) ("Pelovitz Memorandum")). The stated purpose of the Pelovitz Memorandum was to "address [CMS's] position regarding binding arbitration between nursing homes and prospective or current residents, in response to recent marketplace practices." *Id.* at 1.

36.     In relevant part, the Pelovitz Memorandum explained that "[u]nder Medicare, whether to have a binding arbitration agreement is an issue between the resident and the nursing home." Pelovitz Mem. at 1. "Under Medicaid," CMS stated that it would "defer to State law as to whether or not such binding arbitration agreements are permitted subject to the concerns we have where Federal regulations may be implicated." *Id.*

37.     At the same time, CMS stated that it believed that current residents of SNFs and NFs could not be obligated to sign arbitration agreements if they had not done so prior to admission. Pelovitz Mem. at 2. The Pelovitz Memorandum also confirmed that the "existence of a binding arbitration agreement does not in any way affect the ability of the State survey agency or CMS to assess citations for violations of certain regulatory requirements, including those for Quality of Care." *Id.*

38.     As discussed in paragraphs 22–27, above, in the years following the Pelovitz Memorandum, Congress considered and rejected several pieces of legislation that would have amended the FAA to invalidate arbitration agreements between SNFs/NFs and their residents.

**The Proposed Rule**

39.     In July 2015, CMS published a notice of proposed rulemaking soliciting comments on numerous potential revisions to the LTC Requirements. *See* Medicare and Medicaid Programs; Reform of Requirements for Long-Term Care Facilities; Proposed Rule, 80 Fed. Reg. 42,168 (July 16, 2015) (the "Proposed Rule").

40.     As is relevant here, the Proposed Rule suggested adding language to the LTC Requirements that would regulate the manner in which SNFs and NFs enter into arbitration agreements with their residents, as well as to impose some minimum requirements for those agreements. *See* 80 Fed. Reg. at 42,264-65 (proposed 42 C.F.R. § 483.70(n)). For example, the Proposed Rule would have required SNFs/NFs to "ensure" that any arbitration agreement "is explained to the resident in a form and manner that he or she understands," while also imposing requirements on the content of the agreement itself with respect to arbitrator and venue selection. *Id.* CMS also solicited comments on whether it should ban SNFs/NFs from using arbitration agreements altogether. *Id.* at 42,211, 42,242. The Secretary approved the Proposed Rule prior to its issuance. *Id.* at 42,269.

41. CMS explained that it had included the regulation of arbitration agreements in the Proposed Rule to address unspecified "concerns" raised by unidentified "stakeholders." 80 Fed. Reg. at 42,241.

42. The Proposed Rule did not mention the Federal Arbitration Act.

43. The Proposed Rule did not mention the Pelovitz Memorandum.

44. The Proposed Rule did not mention the benefits of arbitration to SNFs, NFs, and their residents.

45. The Proposed Rule did not mention Congress's repeated refusal to amend the FAA in order to invalidate pre-dispute arbitration agreements between SNFs/NFs and their residents.

46. The Proposed Rule did not mention Secretary Leavitt's opposition to legislation seeking to amend the FAA in order to invalidate pre-dispute arbitration agreements between SNFs/NFs and their residents.

### AHCA's Freedom of Information Act Request

47. To comment meaningfully on CMS's arbitration proposals, AHCA submitted a request to CMS under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, asking CMS to produce a copy of the "concerns" raised by "stakeholders" that had been referenced in the Proposed Rule.

48. CMS responded to AHCA's FOIA request by informing AHCA that there was only one such document in CMS's files: a three-year-old letter submitted to CMS by the American Association for Justice ("AAJ"), formerly known as the Association of Trial Lawyers of America ("ATLA"). *See* Letter from Joseph Tripline, Dir., Div. of FOIA Analysis, Ctrs. for Medicare & Medicaid Servs., to Lyn Bentley, Senior Dir. of Reg. Servs., Am. Health Care Ass'n (Aug. 25, 2015) (enclosing Letter from Mary Alice McLarty, Pres., Am. Ass'n for Justice, f/k/a Ass'n of

Trial Lawyers of Am., to Patrick Conway, M.D., Dir., Office of Clinical Standards & Quality, Ctrs. for Medicare & Medicaid Servs. (Aug. 14, 2012) ("AAJ Letter")) (attached as Exhibit C to AHCA Comment Letter).

49. AAJ is an organization that describes itself as a "voluntary national bar association whose members primarily represent individual plaintiffs in civil actions." Br. of Am. Ass'n for Justice as *Amici Curiae* in Supp. of Resps. at 1, *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012) (No. 10-948); *see also* Br. of Am. Ass'n for Justice as *Amici Curiae* in Supp. of Resps. at 1, *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) (No. 09-893) (repeating same description).

50. AHCA distributed the AAJ Letter to interested parties in order to permit them to comment on the AAJ Letter in the course of commenting on the Proposed Rule.

51. CMS subsequently extended the Proposed Rule's 60-day comment period by 30 days, citing "inquiries from Hospital Associations and national industry organizations" claiming that they "needed additional time to respond to the rule due to the scope and complexity of the proposal." Medicare and Medicaid Programs; Reform of Requirements for Long-Term Care Facilities; Reopening of Comment Period, 80 Fed. Reg. 55,284, 55,284 (Sept. 15, 2015).

### Comments Submitted on the Proposed Rule

52. AHCA vigorously opposed CMS's arbitration proposals and commented separately on them to underscore the importance of the issue to SNFs and NFs nationwide. *See* Ex. 3 (Letter from Mark Parkinson, Pres. & Chief Exec. Officer, Am. Health Care Ass'n, to Andrew M. Slavitt, Acting Adm'r, Ctrs. for Medicare & Medicaid Servs. (Oct. 14, 2015) ("AHCA Comment Letter")). AHCA explained that the arbitration proposals should be withdrawn for three independent reasons: (1) the proposals exceeded CMS's statutory authority; (2) the pro-

posals were not necessary to protect resident health and safety; and (3) many of the stated factual and legal grounds for the proposals were incorrect. *Id.*

53. On the question of statutory authority, AHCA explained that the Proposed Rule ignored the Federal Arbitration Act and abundant case law demonstrating that the FAA protected the right of SNFs/NFs to use arbitration agreements. Ex. 3 at 2. AHCA further explained that the general language of the Medicare and Medicaid Acts permitting the Secretary to promulgate requirements relating to resident health and safety did not supply the requisite congressional command to override the FAA, citing federal appellate decisions invalidating attempts by the National Labor Relations Board and the Federal Trade Commission to limit the enforceability of arbitration agreements. *Id.* AHCA also reminded CMS of Congress's repeated refusal to amend the FAA in order to invalidate arbitration agreements between SNFs/NFs and their residents, as well as the fact that when Congress grants federal agencies authority to regulate the use of arbitration agreements, Congress uses unambiguous statutory language to confer that authority. *Id.*

54. On the question of necessity, AHCA explained that any determination of whether a regulation was truly "necessary" under 42 U.S.C. §§ 1395i-3(d)(4)(B) and 1396r(d)(4)(B) had to take into account the costs imposed by the regulation. Ex. 3 at 6-7. CMS had failed to do so. *Id.* AHCA further explained that the Proposed Rule's stated concern regarding the possible inclusion of confidentiality clauses in arbitration agreements was unfounded and, in any event, was remedied by a separate provision of the Proposed Rule precluding SNFs/NFs from prohibiting or discouraging residents from communicating with government officials. *Id.* at 5. AHCA also refuted the Proposed Rule's suggestion that arbitration would be ineffective at promoting resident health and safety. *Id.* at 6.

55.    Lastly, AHCA challenged the accuracy of many of the factual and legal grounds for CMS's arbitration proposals recited in the Proposed Rule. Ex. 3 at 7-9. For example, citing the Pelovitz Memorandum issued by CMS more than a decade earlier, AHCA refuted the Proposed Rule's suggestion that the arbitration proposals were driven by a recent change in business practices. *Id.* at 7–8. AHCA also challenged several statements in the document that had served as the catalyst for CMS's arbitration proposals, explaining that the AAJ Letter painted an anti-arbitration portrait devoid of factual support and detached from reality. *Id.* at 8-9. And it pointed out that—as former Secretary Leavitt had previously observed—pre-dispute arbitration agreements do not prevent state agencies or CMS from investigating and citing SNFs/NFs for violations of regulatory requirements relating to quality of care. *Id.* at 4.

56.    AHCA was not alone in opposing CMS's arbitration proposals. The U.S. Chamber of Commerce also opposed the Proposed Rule, explaining that the Proposed Rule's criticisms of arbitration were unfounded. The Chamber pointed out that claimants prevail at least as often in arbitration as they do in court. Ex. 4 (Comment of Chamber of Commerce of United States of America at 6, Dkt. No. CMS-3260-P (Oct. 14, 2015) ("Chamber Comment")). And it explained that while the Proposed Rule purported not to ban arbitration altogether, its practical effect would be to eliminate arbitration because parties virtually never agree to post-dispute arbitration. *Id.* at 7.

### The Arbitration Rule

57.    CMS completed its rulemaking process by publishing an Arbitration Rule on October 4, 2016. *See* Ex. 1.

58.    The Arbitration Rule categorically bars SNFs/NFs from entering into pre-dispute arbitration agreements with their residents. *See id.* at 68,867 (to be codified at 42 C.F.R. § 483.70(n)).

59.     The Arbitration Rule purports to be based on three different sources of statutory authority:

a. *First*, the Arbitration Rule cites the Secretary's authority to "issue such rules as may be necessary to the efficient administration of the functions of [HHS]." *Id.* at 68,791 (citing 42 U.S.C. §§ 1302, 1395hh).

b. *Second*, the Arbitration Rule cites the Secretary's authority under the Medicare and Medicaid Acts to "require [SNFs/NFs] to 'meet such other requirements relating to the health, safety, [and well-being] of residents * * * as the Secretary may find necessary.'" *Id.* (quoting 42 U.S.C. §§ 1395i-3(d)(4)(B) and 1396r(d)(4)(B)).

c. *Finally*, the Arbitration Rule cites the Secretary's authority to "establish" patient "right[s]" that SNFs/NFs must honor. *Id.* (citing 42 U.S.C. §§ 1395i-3(c)(1)(A)(xi) and 1396r(c)(1)(A)(xi)).

60.     The Arbitration Rule explains that CMS has concluded that "pre-dispute arbitration clauses are, by their very nature, unconscionable." *Id.* at 68,792. The agency claims that: there is "a significant differential in bargaining power between [SNF/NF] residents and [the] facilities" (*id.*); "arbitration can be very expensive for the resident" (*id.* at 68,794); "the limited discovery generally allowed puts the resident at a distinct disadvantage" (*id.*); SNFs/NFs include unconscionable terms in their arbitration agreements, such as damages caps on residents' claims (*id.* at 68,795); and "[n]o resident, resident representative, or facility is being denied the opportunity to engage in arbitration to settle a dispute" because parties can still enter into arbitration agreements after disputes arise. *Id.* at 68,796.

61.     The Arbitration Rule will go into effect on November 28, 2016. Ex. 1 (81 Fed. Reg. at 68,688). The Rule does not address the request of numerous commenters that its implementation be delayed to allow for timely pre-enforcement review.

62. The Secretary formally approved the Arbitration Rule. *Id.* (81 Fed. Reg. at 68,872).

63. CMS's issuance of the Arbitration Rule constitutes "final agency action" under 5 U.S.C. § 704.

64. Plaintiffs have presented their claims to the Secretary of HHS and the Acting Administrator of CMS. *See* Ex. 5 (letter to Secretary of HHS and Acting Administrator of CMS).

65. This pre-enforcement challenge to the Arbitration Rule is ripe for judicial review because the legal issues presented are fit for judicial resolution and because the Arbitration Rule requires an immediate and significant change in how SNFs/NFs conduct their affairs, with serious penalties attached to noncompliance.

**The Arbitration Rule Will Irreparably Harm SNFs/NFs And Their Residents**

66. AHCA's members, the Provider Plaintiffs, and residents of SNFs/NFs will suffer irreparable harm if the Arbitration Rule goes into effect.

67. For example, SNFs/NFs that intentionally refuse to comply with the arbitration ban because they believe it to be illegal will subject themselves to sanctions for failing to comply with the new LTC Requirements. Such sanctions include termination of the facility's participation in the Medicare and Medicaid programs, denial of payment, placement of a temporary manager in the facility, and civil money penalties up to $20,628 per incident for each day that a violation existed. 42 U.S.C. §§ 1395i-3(h)(2) (SNFs), 1396r(h)(2) (NFs). Those sanctions would effectively bankrupt any SNF or NF, threatening the care and well-being of their residents. Moreover, the cost of challenging the imposition of any sanctions in order to challenge the Arbitration Rule's legality, and damages related thereto, would not be recoverable from the Federal Government because of its sovereign immunity.

68.     Meanwhile, SNFs/NFs that choose to comply with the arbitration ban out of fear of sanctions will have to forgo the opportunity of entering into arbitration agreements with new residents. This will harm facilities and residents alike, because arbitration is a fair and more convenient and efficient mechanism for resolving disputes.

69.     Arbitrations generally take only a matter of months to resolve, instead of the years consumed in jury trials. *Compare U.S. District Courts—National Judicial Caseload Profile (2016)*, http://www.uscourts.gov/file/19995/download (as of March 2016, the average civil lawsuit took 26.7 months to reach trial), *with* Consumer Fin. Protection Bureau, *Arbitration Study: Report to Congress 2015*, at section 5, page 73, http://files.consumerfinance.gov/f/ 201503_cfpb_arbitration-study-report-to-congress-2015.pdf (consumer arbitrations through AAA are resolved within 180 days).

70.     Arbitration is also procedurally simpler, which reduces the burden on both parties. Indeed, arbitration's simplified procedures often allow individuals to proceed without a lawyer. *See, e.g.*, Jason Scott Johnston & Todd Zywicki, *The Consumer Financial Protection Bureau's Arbitration Study: A Summary and Critique* 25-26, Mercatus Working Paper, Mercatus Center at George Mason University, Arlington, VA (Aug. 2015) ("hiring an attorney * * * is often unnecessary [in arbitration]"). This aspect of arbitration is particularly beneficial to residents with smaller claims, such as a billing dispute over a particular procedure. For these claims to proceed in court, it may not be cost effective to pay a lawyer on an hourly or flat-fee basis. And lawyers would be unwilling—because of the small stakes—to take the case on a contingency-fee basis. Yet the complexities of judicial litigation make pursuit of these claims on a *pro se* impossible. Thus, without arbitration, residents with these claims would be priced out of the judicial system.

71.     At the same time, SNFs and NFs will also face increased legal costs. In fact, the increase in the cost of dispute resolution will also cause an increase in insurance premiums for

- 20 -

SNFs/NFs, because insurers take the presence or absence of such agreements into account when setting premiums. *See* AHCA Comment Letter at 7. Some SNFs/NFs may become unable to obtain insurance at all, much less at a premium level that they can afford.

72. Finally, because the cost of providing nursing services at SNFs/NFs will increase, the cost of such services to residents will also inevitably increase. This will be a financial burden on the residents of SNFs/NFs and their families—the very people whom the Arbitration Rule seeks to protect.

73. The arbitration ban also threatens the many residents whose care is funded solely via Medicare or Medicaid. For those residents, the increased costs to SNFs/NFs resulting from the Arbitration Rule cannot be recouped at all; Medicare and Medicaid reimbursements are fixed by law. To account for this revenue shortfall, money that otherwise would have been spent on patient care inevitably will be funneled to pay for increased litigation and insurance costs.

74. Yet these burdens that the arbitration ban will impose are not necessary to protect quality of care for SNF/NF residents. The quality of care being provided at SNFs/NFs—in terms of staffing levels, pain levels, and the number of quality-of-care citations issued—has been improving steadily since the early 2000s. *See Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. On Commercial & Admin. Law of the H. Comm. on the Judiciary*, 110th Cong. 33 (2008) (citing CMS data).

75. Moreover, arbitration has been repeatedly shown to be fair to both sides and a preferable alternative to court proceedings. For example, a 2015 survey of parties and attorneys who participated in arbitrations under the Kaiser Foundation Health Plan's arbitration system—which covers more than 7 million members in California—showed that 90 percent of the respondents who went through arbitrations that year reported that the arbitration system was as good or better than the state court system. *Annual Report of the Office of the Independent Admin-*

*istrator of the Kaiser Foundation Health Plan, Inc. Mandatory Arbitration System for Disputes with Health Plan Members, January 1, 2015 – December 31, 2015* at 53, *available at* http://www.oia-kaiserarb.com/pdfs/2015-Annual-Report.pdf.

76. The Arbitration Rule does not meaningfully consider the harms that SNFs/NFs and their residents would experience. Nor does it meaningfully acknowledge the benefits of arbitration and analyze whether depriving SNFs/NFs and their residents of these benefits is warranted.

77. The Arbitration Rule would inflict immediate irreparable injury on Plaintiffs and SNFs/NFs across the country if it is not preliminarily enjoined during the pendency of this action.

78. First, the Provider Plaintiffs and other SNFs/NFs, including AHCA and MHCA members, would incur various administrative expenses complying with the Arbitration Rule, such as by revising admissions agreements and retraining staff on admissions and dispute-resolution policies. Provider Plaintiffs and other SNFs/NFs would also face higher premiums as insurers raise rates in response to the Arbitration Rule. These costs could not be recouped once the Arbitration Rule is invalidated.

79. In addition, numerous residents and patients would be admitted to the Provider Plaintiffs and other SNFs/NFs, including AHCA and MHCA members, while this action is pending. If the Arbitration Rule is allowed to go into effect, the SNFs/NFs and those new admittees would be unable to enter into pre-dispute arbitration agreements. That would deprive both parties of the benefits of arbitration. Any disputes that arise during the pendency of this action would instead be resolved in slow and expensive court actions. That increase in the cost of dispute resolution would not be recoverable if the Arbitration Rule were invalidated.

80.     Nor could the Provider Plaintiffs and other SNFs/NFs, including AHCA and MHCA members, enter into pre-dispute arbitration agreements after entry of a final judgment invalidating the Arbitration Rule with all of those residents and patients admitted while this action is pending. Many of those residents and patients would be both admitted and discharged before the merits of this case are finally resolved—making it impossible to change the parties' legal relationship. Moreover, many residents and patients who would have entered into pre-dispute arbitration agreements during the admissions process may be unwilling to do so later, as they deem the legal relationship to be fixed.

## CAUSES OF ACTION

### COUNT I:
**The Arbitration Ban Violates The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, To The Extent It Is Based on The Secretary's Authority Under The Medicare Act**

81.     Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

82.     Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

83.     The Arbitration Rule should be held unlawful and set aside because it transgresses the "statutory * * * limitations" imposed by the FAA.

84.     Under the FAA, a "written provision in * * * a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, * * * shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

85.     A federal agency cannot create exceptions to the FAA's mandate of enforceability unless it has been authorized to do so by Congress, through express, unambiguous statutory language. *See CompuCredit*, 132 S. Ct. at 665.

86. The Medicare Act does not contain any language, let alone express and unambiguous language, authorizing the Secretary to regulate the use of arbitration agreements by SNFs.

87. The Arbitration Rule cannot be defended on the ground that it is not a direct regulation, but rather an exercise of CMS's power to place conditions on receipt of Medicare funds. Just as the FAA prohibits agencies from regulating arbitration directly absent a congressional authorization to do so, it also prohibits them from regulating arbitration indirectly by imposing a substantial disincentive on the use of arbitration.

88. Moreover, CMS's threat of a total loss of an SNF's Medicare funding to coerce it into giving up its right to enter into arbitration agreements is the legal equivalent of regulation, given SNFs' dependence on Medicare funding for their operations. *See, e.g., Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2605 (2012) (striking down provision of Affordable Care Act that constituted "economic dragooning that leaves the States with no real option but to acquiesce" to the government's policy).

89. The arbitration ban in the Arbitration Rule is therefore precluded by the FAA because it purports to prohibit SNFs from entering into arbitration agreements that the FAA declares enforceable.

## COUNT II:
### The Arbitration Ban Violates The Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, To The Extent It Is Based on The Secretary's Authority Under The Medicaid Act

90. Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

91. Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

92. The Arbitration Rule should be held unlawful and set aside because it transgresses the "statutory * * * limitations" of the FAA.

- 24 -

93. The Medicaid Act does not contain any language, let alone express and unambiguous language, authorizing the Secretary to regulate the use of arbitration agreements by NFs.

94. The Arbitration Rule cannot be defended on the ground that it is not a direct regulation, but rather an exercise of CMS's power to place conditions on receipt of Medicaid funds. Just as the FAA prohibits agencies from regulating arbitration directly absent a congressional authorization to do so, it also prohibits them from regulating arbitration indirectly by imposing substantial disincentives on the use of arbitration.

95. Moreover, CMS's threat of a total loss of an NF's Medicaid funding to coerce it into giving up its right to enter into arbitration agreements is the legal equivalent of regulation, given NFs' dependence on Medicaid funding for their operations. *See, e.g., Nat'l Fed. of Indep. Bus.*, 132 S. Ct. at 2605 (striking down provision of Affordable Care Act that constituted "economic dragooning that leaves the States with no real option but to acquiesce" to the government's policy).

96. The arbitration ban in the Arbitration Rule is therefore precluded by the FAA because it purports to prohibit NFs from entering into arbitration agreements that the FAA declares enforceable.

### COUNT III:
### The Arbitration Ban Exceeds the Secretary's
### Statutory Authority Under the Medicare Act, 42 U.S.C. §§ 1395 to 1395*lll*

97. Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

98. Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

99. The Medicare Act does not provide "statutory * * * authority" for the Arbitration Rule.

100. The arbitration ban cannot be based on the Secretary's authority to prescribe regulations related to the efficient functioning of HHS. *See* 42 U.S.C. §§ 1302, 1395hh. Whatever rulemaking authority those provisions convey does not authorize a ban of arbitration, because the method of dispute resolution used by an SNF has nothing to do with the administration of Medicare, the processing of Medicare claims, or the SNF's provision of services to Medicare beneficiaries.

101. Nor can the Arbitration Rule be based on the Secretary's authority to prescribe "such other requirements relating to the health, safety, and well-being of residents" of SNFs "as the Secretary may find necessary." 42 U.S.C. § 1395i-3(d)(4)(B). This provision does not authorize the Secretary to regulate the terms of dispute resolution between SNFs and residents, which are unrelated to residents' health, safety, or well-being.

102. The Secretary contends that arbitration agreements affect the quality of care received by residents because "not having the threat of a substantial jury verdict" creates "negative incentives on staffing and care." Ex. 1 (81 Fed. Reg. at 68,793). But there is no evidence in the record to support that conclusion. On the contrary, the evidence in the record demonstrated that arbitration allows residents to vindicate their legal rights effectively.

103. Finally, the Arbitration Rule cannot be based on the Secretary's authority to prescribe resident "rights." 42 U.S.C. § 1395i-3(c)(1)(A)(xi). That authority does not encompass dispute-resolution procedures and, in addition, the Secretary could not lawfully determine that using courts to resolve disputes, and not arbitration, can qualify as such a "right."

104. Even if the Secretary could reasonably determine that residents should have the ability to access courts, residents would have the ability to waive that right in exchange for fair and efficient arbitration of disputes—an option the Arbitration Rule forecloses.

105. The Arbitration Rule's exception for post-dispute arbitration agreements does not adequately preserve residents' ability to choose arbitration. As one commentator has explained in another context, post-dispute arbitration agreements "amount to nothing more than a beguiling mirage" because once a dispute has arisen, the parties' emotional investment in the case—and their lawyers' self-interest—virtually always prevents them from agreeing to arbitration. Theodore J. St. Antoine, *Mandatory Arbitration: Why It's Better than It Looks*, 41 U. Mich. J.L. Reform 783, 790 (2008). Moreover, even if a few residents enter into post-dispute arbitration agreements, the lion's share of the cost savings afforded by binding pre-dispute arbitration agreements is forever lost, resulting in higher operating costs for SNFs and higher prices for residents. In order for the benefits of arbitration to be preserved, SNFs must be permitted to offer pre-dispute arbitration agreements.

106. Because none of the provisions of the Medicare Act cited by the Secretary authorizes the arbitration ban in the Arbitration Rule, the Rule must be vacated.

**COUNT IV:**
**The Arbitration Ban Exceeds the Secretary's**
**Statutory Authority Under the Medicaid Act, 42 U.S.C. §§ 1396 to 1396w-5**

107. Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

108. Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

109. The Medicaid Act does not provide "statutory * * * authority" for the arbitration ban in the Arbitration Rule.

110. The arbitration ban cannot be based on the Secretary's authority to prescribe regulations related to the efficient functioning of HHS. *See* 42 U.S.C. §§ 1302, 1395hh. Whatever rulemaking authority those provisions convey does not authorize the arbitration ban, because the

method of dispute resolution used by an NF has nothing to do with the administration of Medicaid, the processing of Medicaid claims, or the NF's provision of services to Medicaid beneficiaries.

111. Nor can the arbitration ban be based on the Secretary's authority to prescribe "such other requirements relating to the health and safety of residents" of NFs "as the Secretary may find necessary." 42 U.S.C. § 1396r(d)(4)(B). This provision does not authorize the Secretary to regulate the terms of dispute resolution between NFs and residents, which are unrelated to residents' health, safety, or well-being.

112. The Secretary contends that arbitration agreements affect the quality of care received by residents because "not having the threat of a substantial jury verdict" creates "negative incentives on staffing and care." Ex. 1 (81 Fed. Reg. at 68,793). But there is no evidence in the record to support that conclusion. On the contrary, the evidence in the record demonstrated that arbitration allows residents to vindicate their legal rights effectively.

113. Finally, the arbitration ban cannot be based on the Secretary's authority to prescribe resident "rights." 42 U.S.C. § 1396r(c)(1)(A)(xi). That authority does not encompass dispute-resolution procedures and, in addition, the Secretary could not lawfully determine that using courts to resolve disputes, and not arbitration, can qualify as such a "right."

114. Even if the Secretary could reasonably determine that residents should have the ability to access courts, residents would have the ability to waive that right by signing a voluntary pre-dispute arbitration agreement—an option that the Arbitration Rule forecloses.

115. The Arbitration Rule's exception for post-dispute arbitration agreements does not adequately preserve residents' ability to choose arbitration. As noted above, the dynamics of litigation generally prevent parties from entering into post-dispute arbitration agreements, and virtually all of the cost savings of arbitration would be lost.

116. Because none of the provisions of the Medicaid Act cited by the Secretary authorizes the arbitration ban in the Arbitration Rule, the Rule must be vacated.

## COUNT V:
### The Arbitration Ban Is Arbitrary and Capricious To The Extent It Is Based on The Secretary's Authority Under The Medicare Act

117. Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

118. Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency also acts arbitrarily and capriciously if it changes its position without "supply[ing] a reasoned analysis for the change." *Id.* at 42. An agency must at least "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal quotation marks and citation omitted). And "[i]n explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (internal quotation marks omitted).

119. The Arbitration Rule is arbitrary and capricious because it makes an unreasoned shift from CMS's earlier position, expressed in the Pelovitz Memorandum and Secretary Leavitt's letter to Congress, that arbitration between SNFs/NFs and residents should be permitted. The long-term care industry has relied on that earlier position and entered into millions of arbitration agreements with residents and patients.

- 29 -

120. The Arbitration Rule states that its ban on arbitration does not "contradict" the Pelovitz Memorandum because the Rule "does not in any way prohibit the use of post-dispute arbitration agreements." Ex. 1 (81 Fed. Reg. at 68,792). But that assertion is patently false. The Pelovitz Memorandum "address[ed] the use of an agreement that requires disputes between a *prospective* or current resident and a nursing home be resolved through binding arbitration"— *i.e.*, a pre-dispute arbitration agreement. Ex. 2 at 1 (emphasis added). The Pelovitz Memorandum stated that the decision whether to have *any* arbitration agreement was "an issue between the resident and the nursing home." *Id.* CMS has not offered any reason why it has departed from that earlier conclusion.

121. Similarly, though the agencies claim that the Arbitration Rule is consistent with Secretary Leavitt's letter because it bans only pre-dispute arbitration, that conclusion is mistaken. Secretary Leavitt expressly endorsed the use of pre-dispute arbitration agreements, stating that "[p]re-dispute arbitration agreements are an excellent way for patients and providers to control costs, resolve disputes, and speed resolution of conflicts." H.R. Rep. 110-894, at 13. Moreover, as explained *supra*, at ¶ 105, the Arbitration Rule will eliminate arbitration altogether because post-dispute arbitration is not a viable option for SNFs/NFs and residents.

122. The arbitration ban in the Arbitration Rule is also arbitrary and capricious because the Secretary's conclusions "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

123. The Secretary determined, among other things, that arbitration removes the incentives for SNFs/NFs to comply with the law (Ex. 1 (81 Fed. Reg. at 68,793)); that it "result[s] in [procedural] disadvantages to residents" (*id.* at 68,794); that it "can be very expensive for the resident" (*id.*); that the use of arbitration deters residents from bringing claims (*id.*); and that it is

"usually confidential and secretive." *Id.* at 68,797. The Secretary based these conclusions on selective anecdotes from commenters and academic articles.

124. But the overwhelming empirical evidence before the agencies showed the opposite. As discussed above, that evidence demonstrated that (i) arbitration is fair to both sides; (ii) it reduces the costs of dispute resolution, increasing claimants' access to justice and making it *more* likely that residents can bring claims; and (iii) residents are not required to agree to confidentiality in order to arbitrate. *See generally* Ex. 3 at 5-7; Ex. 4 at 3-12.

125. Because the Arbitration Rule's conclusions cannot be squared with the evidence before the agencies or the agencies' own prior position about arbitration, it must be vacated.

### COUNT VI:
### The Arbitration Ban Is Arbitrary and Capricious To The Extent It Is Based on The Secretary's Authority Under The Medicaid Act

126. Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

127. Pursuant to 5 U.S.C. § 706, a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. An agency also acts arbitrarily and capriciously if it changes its position without "supply[ing] a reasoned analysis for the change." *Id.* at 42.

128. The Arbitration Rule is arbitrary and capricious because it makes an unreasoned shift from CMS's earlier position, expressed in the Pelovitz Memorandum and Secretary

Leavitt's letter to Congress, that arbitration between SNFs/NFs and residents should be permitted.

129. The Arbitration Rule claims that its ban on arbitration does not "contradict" the Pelovitz Memorandum because the Rule "does not in any way prohibit the use of post-dispute arbitration agreements." Ex. 1 (81 Fed. Reg. at 68,792). But that assertion is patently false. The Pelovitz Memorandum "address[ed] the use of an agreement that requires disputes between a *prospective* or current resident and a nursing home be resolved through binding arbitration"— *i.e.*, a pre-dispute arbitration agreement. Ex. 2 at 1 (emphasis added). The Pelovitz Memorandum stated that the decision whether to have *any* arbitration agreement was "an issue between the resident and the nursing home." *Id.* CMS has not offered any reason why it has departed from that earlier conclusion.

130. Similarly, though the agencies claim that the Arbitration Rule is consistent with Secretary Leavitt's letter because it bans only pre-dispute arbitration, that conclusion is mistaken. Secretary Leavitt expressly endorsed the use of pre-dispute arbitration agreements, stating that "[p]re-dispute arbitration agreements are an excellent way for patients and providers to control costs, resolve disputes, and speed resolution of conflicts." H.R. Rep. 110-894, at 13. Moreover, as explained *supra*, at ¶ 105, the Arbitration Rule will eliminate arbitration altogether because post-dispute arbitration is not a viable option for SNFs/NFs and residents.

131. The arbitration ban in the Arbitration Rule is also arbitrary and capricious because the Secretary's conclusions "run[] counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

132. The Secretary determined, among other things, that arbitration removes the incentives for SNFs/NFs to comply with the law (Ex. 1 (81 Fed. Reg. at 68,793)); that it "result[s] in [procedural] disadvantages to residents" (*id.* at 68,794); that it "can be very expensive for the

resident" (*id.*); that the use of arbitration deters residents from bringing claims (*id.*); and that it is "usually confidential and secretive." *Id.* at 68,797. The Secretary based these conclusions on selective anecdotes from commenters and academic articles.

133.    But the overwhelming empirical evidence before the agencies showed the opposite. As discussed above, that evidence demonstrated that arbitration (i) is fair to both sides; (ii) reduces the costs of dispute resolution, increasing claimants' access to justice and making it *more* likely that residents can bring claims; and (iii) residents are not required to agree to confidentiality in order to arbitrate. *See generally* Ex. 3 at 5-7; Ex. 4 at 3-12.

134.    Because the Arbitration Rule's conclusions cannot be squared with the evidence before the agencies or the agencies' own prior position about arbitration, it must be vacated.

**COUNT VII:**
**The Arbitration Ban Must Be Vacated Because The Agencies Did Not Comply With The Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.***

135.    Plaintiffs repeat and reallege paragraphs 1-80 as if set forth fully herein.

136.    Under the Regulatory Flexibility Act (RFA), a final agency rule must contain a final "regulatory flexibility analysis," which gives "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the Arbitration Rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(6). The agency may omit this analysis if "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

137.    In the regulation adopting the Arbitration Rule, the agencies certified that no regulatory flexibility analysis was needed. Ex. 1 (81 Fed. Reg. at 68,846). They stated that they

had calculated the costs of complying with the regulation and determined that the average impact of the regulation would amount to "less than 1 percent" of an SNF/NF's revenue. *Id.*

138.   CMS's and HHS's RFA analysis did not contain any assessment of the costs of the Arbitration Rule's arbitration ban. *Id.* at 68,844.

139.   The agencies thus failed to comply with the RFA. It is indisputable that the arbitration ban will impose costs on SNFs/NFs by requiring them to resolve disputes more expensively in court, raising their insurance premiums, and forcing them to change their internal procedures. The Arbitration Rule should have acknowledged these costs and assessed whether they would have a "significant economic impact" on SNFs/NFs.

140.   Because the agencies failed to comply with the RFA, the Arbitration Rule was promulgated "without observance of procedure required by law" and must be vacated. 5 U.S.C. § 706(2)(D); *see also, e.g., Nat'l Fed'n of Indep. Bus. v. Perez*, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016) (holding that Department of Labor violated RFA by failing to consider important costs of a rule).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.   Provide for expeditious proceedings in this action in light of the Rule's November 28, 2016, effective date;

B.   Preliminarily enjoin the Secretary and Acting Administrator, their employees, and their agents from enforcing the Arbitration Rule in any respect, pending this Court's entry of a final judgment in this action;

C.   Enter judgment in favor of Plaintiffs;

D.   Declare that the Arbitration Rule is unlawful and set it aside;

E.      Permanently enjoin the Secretary and Acting Administrator, their employees, and their agents from enforcing the Arbitration Rule; and

F.      Grant Plaintiffs such other relief as the Court deems just and proper.

Dated: October 17, 2016                              Respectfully submitted,

                                        By:   s/ John L. Maxey
                                              John L. Maxey II (MS Bar No. 1946)
                                              S. Mark Wann (MS Bar No. 6936)
                                              Marjorie Selby Busching Self (MS Bar No. 100523)
                                              MAXEY WANN PLLC
                                              210 East Capitol Street, Suite 2100
                                              Jackson, MS 39201
                                              (601) 355-8855
                                              (601) 355-8881 (fax)
                                              john@maxeywann.com

                                              Andrew J. Pincus[*]
                                              Archis A. Parasharami[*]
                                              Kevin S. Ranlett[*]
                                              MAYER BROWN LLP
                                              1999 K Street NW
                                              Washington, DC 20006
                                              (202) 263-3000
                                              (202) 263-3300 (fax)
                                              apincus@mayerbrown.com

                                              *Counsel for Plaintiffs American Health Care Association, Mississippi Health Care Association, Great Oaks Rehabilitation and Healthcare Center, LLC d/b/a Great Oaks Rehabilitation and Healthcare Center, Community Care of Vicksburg LLC d/b/a Heritage House Nursing Center, and Mansfield Long Term Care, LLC d/b/a The Pavilion at Creekwood*

                                              [*] *Motion for Admission Pro Hac Vice To Be Filed*