**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**AMERICAN HEALTH CARE ASSOCIATION,**
**MISSISSIPPI HEALTH CARE ASSOCIATION,**
**GREAT OAKS REHABILITATION AND HEALTHCARE**
**CENTER, LLC, COMMUNITY CARE OF VICKSBURG,**
**MANSFIELD LONG TERM CARE, LLC**                                    **PLAINTIFFS**

                                                  **CIVIL ACTION NO. 3:16-CV-00233**

**SYLVIA MATHEWS BURWELL, In Her Official**
**Capacity as Secretary of Health and Human Services and**
**ANDREW M. SLAVITT, In His Official Capacity as Acting**
**Administrator of the Centers for Medicare and Medicaid**
**Services**                                                          **DEFENDANTS**

<u>**ORDER**</u>

　　　Plaintiffs[1] have filed a motion with this court seeking a preliminary injunction enjoining

defendants from enforcing a new Rule enacted by the Center for Medicare and Medicaid Services

("CMS") which would effectively bar nursing homes receiving federal funds from entering into

new pre-dispute arbitration agreements with their residents, starting November 28, 2016.

Defendants Sylvia Mathews Burwell, the Secretary of Health and Human Services ("HHS") and

Andrew M. Slavitt, the Acting Administrator of CMS, have responded in opposition to the

motion.  This Court, having considered the submissions of the parties and *amicus curiae*, and

---

　　　[1]The plaintiffs in this action include the American Health Care Association ("AHCA") and
the Mississippi Health Care Association ("MHCA"), as well as three Mississippi nursing homes,
namely Great Oaks Rehabilitation and Healthcare Center, LLC d/b/a Great Oaks Rehabilitation
and Healthcare Center ("Great Oaks"), Community Care of Vicksburg, LLC d/b/a Heritage
House Nursing Center ("Heritage House"), and Mansfield Long Term Care, LLC d/b/a The
Pavilion at Creekwood ("The Pavilion").

having conducted a hearing on the motion for preliminary injunction, concludes that the motion is well taken and should be granted.

## Background and Procedural History

In July 2015, CMS proposed to revise the regulations governing participation of long term care ("LTC") facilities in Medicare and Medicaid. 80 Fed. Reg. 42,168, 42,169 (July 16, 2015). The changes were meant, among other things, "to improve the quality of life, care, and services in LTC facilities, optimize resident safety, [and] reflect current professional standards." *Id*. In the proposed rule, CMS expressed a number of concerns about the use of agreements requiring residents of LTC facilities to submit any disputes with the facility to binding arbitration. In light of these concerns, CMS proposed, and requested public comments on, several requirements regarding the execution and content of arbitration agreements, including a requirement that admission to a facility "not be contingent upon the resident or the [resident's] representative signing a binding arbitration agreement." *Id*. at 42,265. The agency also expressed concern that the requirements it contemplated might be insufficient and therefore solicited comments on whether arbitration agreements should be prohibited entirely. *Id*. at 42,211, 42,242.

CMS received more than 9,800 public comments on the comprehensive revision of the regulations, almost 1,000 of which related to arbitration. After considering those comments, as well as conducting research into scholarly articles and court decisions, CMS became "convinced that requiring residents to sign pre-dispute arbitration agreements is fundamentally unfair because, among other things, it is almost impossible for residents or their decision-makers to give fully informed and voluntary consent to arbitration before a dispute has arisen." *Id*. at 68,792.

Thus, the agency decided to promulgate a regulation – now codified at 42 C.F.R. § 483.70(n)(1) – providing that, effective November 28, 2016, LTC facilities that participate in Medicare or Medicaid "must not enter into a predispute agreement for binding arbitration with any resident or resident's representative nor require that a resident sign an arbitration agreement as a condition of admission to the LTC facility." 81 Fed. Reg. at 68,867. The agency characterized this approach as a middle ground, writing that "[w]hile some commenters have requested that we ban all arbitration, we have determined, at this point, to implement a policy that strikes a balance between banning arbitration in all situations and allowing unfettered use of [post-dispute] arbitration clauses . . . ." *Id*. at 68,799. This approach, CMS observed, would "allow residents to avail themselves of the benefits of arbitration once a dispute has arisen and the resident and/or his/her representatives can determine whether it may be an advantageous forum for them." *Id*. at 68,795.

Concerned by the planned restrictions on nursing home arbitration, the plaintiffs in this case formally presented their objections to the Rule by letter to the Secretary of HHS and the Acting Administrator of CMS. Compl. Ex. 5. Cognizant of the fact that the Rule was nevertheless set to go into effect on November 28, plaintiffs filed, on October 17, 2016, the instant complaint in this court. The complaint, which is filed pursuant to the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), seeks the "entry of a declaratory judgment that the Arbitration Rule is unlawful and entry of orders preliminarily and permanently enjoining the Secretary and the Acting Administrator from enforcing the Arbitration Rule when it is scheduled to take effect on November 28, 2016."

On November 3, 2016, this court conducted a hearing on the motion for preliminary

injunction, and, having considered the parties' arguments, is prepared to rule.

## Analysis

### I. General Observations and Experiences Regarding Nursing Home Arbitration

Prior to discussing the preliminary injunction factors, this court will first address an argument which permeates plaintiffs' entire motion: the notion that nursing home arbitration is a fast and efficient process. In so arguing, plaintiffs appear to focus selectively on the nursing home cases which actually go to arbitration, without considering nursing home arbitration litigation as a whole. Given that plaintiffs have emphasized the issue so much in their motion, this court considers it proper to discuss its experiences with the broader subject of nursing home arbitration litigation. As discussed below, this court will not rule based on these experiences but does consider the recent history of arbitration-related litigation in this court useful in providing a fuller picture than that set forth in plaintiffs' briefing.

It is submitted that there is one intractable problem affecting nursing home arbitration, and no other form of arbitration, namely mental competency. This court has previously discussed this issue at some length, most recently in *Jackson v. GGNSC*, 2016 WL 1104492 (N.D. Miss. 2016). This court would hasten to add that the mental competency problem is "nobody's fault;" it simply reflects the reality that, according to the National Center for Health Statistics, 50.4% of nursing home residents have been diagnosed with Alzheimer's or other dementias. See http://www.cdc.gov/nchs/fastats/alzheimers.htm. Arbitration agreements are contracts, and basic contract law requires that the parties to a contract be mentally competent at

the time of execution of the agreement. Moreover, while the FAA strongly supports the practice of arbitration, its savings clause expressly preserves generally applicable contractual defenses. There is no more basic defense to the validity of a contract than lack of mental competency.

In a 2015 letter brief to CMS, plaintiff AHCA addressed the mental competency concerns raised by the American Trial Lawyers Association (ATLA) as follows:

> The ATLA Letter also claims - again without citation of any authority - that "[c]ourts have upheld [arbitration] clauses signed by residents who were illiterate or too disabled with dementia to understand the contract or its implications." In fact, courts will invalidate arbitration agreements if they find that signatories lacked the mental capacity to contract, which is the type of generally applicable contract defense left intact by the FAA.

(AHCA letter at 9). This is, in this court's experience, a very selective description of the impact of the mental competency issue on nursing home arbitration litigation. While it is true that courts will invalidate arbitration agreements signed by residents they find to be incompetent, the AHCA letter omits the facts that, in this court's experience: 1) Many nursing homes will obtain signatures from residents in spite of grave doubts about their mental competency, or, more often, they will choose to have relatives of the residents sign the agreements, even when no power of attorney has been executed; 2) Many of these same nursing homes will later file motions to compel arbitration on the basis of those suspect arbitration agreements; and 3) The litigation of these arbitration actions can only be resolved in time-consuming litigation, which serves as a very significant incentive against filing suit in the first place. This court has repeatedly seen these facts play out in its courtroom, and it has seen these fact patterns repeatedly arise in published decisions from other Mississippi courts.

Arbitration-related issues such as mental competency sometimes involve disputes which

can only be resolved by an actual trial. In *Liberty Health & Rehab of Indianola, LLC v. Howarth*, 11 F. Supp. 3d 684, 687 (N.D. Miss. 2014), for example, this court conducted a bench trial to determine whether an elderly nursing home resident who signed a nursing home arbitration contract had the mental competency to do so. This court concluded that he did not, based largely upon a contemporaneous medical exam which revealed, among other things, that he was unable to even state what year it was at the time he signed the agreement. Needless to say, any plaintiff's attorney who fears that he might have to conduct a trial (and possible appeal) on arbitration issues before even starting discovery in the underlying lawsuit must give great pause before agreeing to accept the case. As this court sat on the bench in *Howarth*, attempting to decipher the mental state of a long-deceased individual, in the context of an arbitration action which was producing nothing but expense and delay, it could not help but harbor doubts about the efficiency and fairness of the nursing home arbitration system. *Howarth* was hardly unique in producing such doubts in this court's mind.

In Mississippi, nursing homes very frequently choose to deal with the mental competency issue by simply having relatives sign on behalf of a nursing home resident at the time of admission. Of course, this is perfectly appropriate if a power of attorney or conservatorship has been created, but that is generally not the case. In recent years, the Mississippi Supreme Court has repeatedly rejected, in unanimous decisions, arguments which nursing homes have made in favor of allowing relatives to sign arbitration agreements on behalf of mentally incompetent residents, absent a power of attorney. *See, e.g. Tarvin v. CLC of Jackson, LLC*, 193 So. 3d 633 (Miss. 2016); *Hattiesburg Health & Rehab Center, LLC v. Brown*, 176 So.3d 17, 22–23 (Miss. 2015); *GGNSC v. Johnson*, 109 So.3d 562 (Miss. 2013); *Adams Community Care Center, LLC*

6

*v. Reed*, 37 So.3d 1155 (Miss. 2010); *Mississippi Care Center of Greenville, LLC v. Hinyub,* 975 So.2d 211, 218 (Miss. 2008).

While the plaintiffs ultimately prevailed in these Mississippi Supreme Court cases, their victories may fairly be regarded as pyrrhic, considering the time and expense involved. When a nursing home chooses to litigate arbitration issues at both the trial and appellate level, it can easily delay the underlying lawsuit for years. In *Johnson*, for example, the plaintiff filed suit on May 24, 2010, and the nursing home filed a motion to compel arbitration soon afterwards. *Johnson*, 109 So.3d at 564. The Supreme Court issued an order unanimously denying the motion to compel arbitration on March 21, 2013. *Id.* The plaintiff thus saw her lawsuit delayed by almost three years while litigating arbitration issues which, the Mississippi Supreme Court held, had no merit. In arguing that nursing home arbitration is an efficient process, plaintiffs do not mention cases such as these.

For those nursing homes inclined to use it, this court is unaware of any form of litigation which provides as effective a tool for pure delay, while not advancing the underlying litigation, as nursing home arbitration litigation. This is partly due to the inherent difficulty in deciding nursing home arbitration-related issues, such as mental competency and agency. In resolving such issues, the most important witness, the resident, will generally have died by the time the lawsuit is filed, making it exceedingly difficult to determine, after the fact, the decedent's level of mental competency or whether he authorized a relative to sign on his behalf (particularly since the relevant agency standards are quite vague). Moreover, the surviving witnesses testifying in these matters usually find themselves aligned with either the plaintiff or the nursing home, and thus often have a motive for selective memories. Considered together, these factors frequently

make it nearly impossible for courts to reliably resolve nursing home arbitration issues.

While this court has the above views regarding nursing home arbitration and is sympathetic to the issues presented, in chambers research suggests that the court's decision must be based on the administrative record, as opposed to prior experience. It is well established that, in an action under the APA, the court's analysis should be limited to the administrative record that was before the agency when it promulgated the challenged regulation. *See Kappos v. Hyatt*, 132 S. Ct. 1690, 1696 (2012) ("Under the APA, judicial review of an agency decision is typically limited to the administrative record.").

Ordinarily, one might expect that a court could take judicial notice of its own experiences, and of the Mississippi Supreme Court, as set forth in published opinions. This court initially intended to do so. This court's review of precedent suggests, however, that even the use of judicial notice is highly restricted in the context of APA actions. In *Silver State Land v. Beaudreau*, 59 F. Supp. 3d 158 (D.D.C. 2014), for example, a federal district court in the District of Columbia refused to take judicial notice of a Nevada court order which was favorable to the plaintiff, writing that:

> Judicial notice is "typically an inadequate mechanism" for a court to consider extra-record evidence in reviewing an agency action. *Dist. Hosp. Partners, L.P. v. Sebelius,* 971 F. Supp. 2d 15, 32 n. 14 (D.D.C. 2013). "Instead, a court may only consider an adjudicative fact subject to judicial notice that is not part of the administrative record if it qualifies for supplementation as extra-record evidence under [*Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989)]." *Id.* (*citing Cnty. of San Miguel v. Kempthorne*, 587 F.Supp.2d at 78–79) (emphasis in original).

*Silver State Land*, 59 F. Supp. 3d at 172. This court has reviewed potential exceptions to the general rule stated above, but does not find that any are applicable in this case. Moreover, after considering the reasons for the rule, it frankly does not take issue with its wisdom.

APA actions challenging federal agency rules may be filed in district courts throughout the United States, and it is clear that the results of those proceedings should not depend upon the experiences of whatever district judge happens to hear the case. Federal agencies would likely find it difficult to function effectively if such were the case. Federalism is bottomed on the rule of law, rather than the experiential-based notions of one judge. This court therefore will limit its analysis to the record before CMS when it acted upon the Rule.

## II. Likelihood of Success on the Merits

The Fifth Circuit has stated that the four elements a plaintiff must establish to secure a preliminary injunction are:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). The court now turns to the first preliminary injunction factor, which asks whether plaintiffs have demonstrated a likelihood of succeeding on the merits in this case.

## II. Likelihood of Success (a)  Is the Rule barred by the Federal Arbitration Act?

In determining which party is likely to prevail in this action, this court first addresses the issue of whether the Rule enacted by CMS in this case is barred by the FAA. Defendants argue that the Rule in this case does not bar arbitration agreements already in existence, but merely provides strong financial disincentives (by withholding federal funding) for nursing homes to

enter into new arbitration contracts, thus allowing the Rule to withstand FAA scrutiny. This argument has two parts, and this court will first address defendants' assertion that the Rule merely provides "incentives" against nursing home arbitration contracts.

In addressing this issue, plaintiffs insist that "the rule does much more than provide an incentive to stop using arbitration agreements—it coerces providers into giving up their right to enter into arbitration agreements by threatening to withdraw Medicare and Medicaid funding entirely from any facility that continues to use arbitration." [Plaintiffs' brief at 10]. Plaintiffs further argue that "an agency may not use its spending power to engage in 'economic dragooning' that leaves parties with 'no real option but to acquiesce to the government's preferred policy.'" *Id.*, citing *Nat'l Fed. of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2605 (2012).

Defendants counter that *Sebelius* has a number of distinguishing facts, and they appear to be correct. Nevertheless, this court believes that plaintiffs' basic point still stands: that nursing homes are so dependent upon Medicare and Medicaid funding that the Rule in this case effectively amounts to a ban on pre-dispute nursing home arbitration contracts. This court believes that the Rule should, and likely will be, treated as what it effectively is (i.e. a *de facto* ban), in determining whether it conflicts with the FAA. Moreover, it should be noted that, even if the Rule in this case is interpreted as a mere "incentive" against arbitration, this does not necessarily mean that singling out a form of arbitration for such disincentives allows it to survive FAA scrutiny. This court accordingly finds defendants' argument on this point unpersuasive.

That brings the court to the second part of defendants' argument, namely that the fact that the Rule in this case does not negate *existing* arbitration contracts allows it to be harmonized with the FAA. Defendants might well have a point, if only the specific language of the FAA

were considered.  Section 2 of the FAA provides that:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  On its face, this language merely states that arbitration contracts which are already in existence are valid and enforceable, save for grounds generally applicable to contracts as a whole.  This court cannot exclude the possibility that the Fifth Circuit would interpret this language as permitting the prospective banning of nursing home arbitration contracts, but it seems unlikely that it will do so.

In so concluding, the court notes that plaintiffs are able to cite powerful persuasive authority in favor of their position on this issue.  In *Saturn Distribution Corp. v. Williams*, 905 F.2d 719, 723 (4th Cir. 1990), for example, the Fourth Circuit rejected the argument "that the scope of FAA preemption is limited to laws covering existing arbitration agreements, and does not extend to laws that prohibit or regulate the formation of arbitration agreements."  Striking down a Virginia law "that prohibit[ed] automobile manufacturers and dealers from entering into agreements that contain mandatory alternative dispute resolution provisions," the *Saturn* court explained that "[t]o restrict the FAA to existing agreements would be to allow states to 'wholly eviscerate Congressional intent to place arbitration agreements upon the same footing as other contracts.'" *Id.* at 722, 723 (internal quotation marks omitted).  In reaching its decision, the Fourth Circuit wrote that "[w]e have not discovered a single authority which squarely addresses the issue and adopts the Commissioner's narrow interpretation of the scope of FAA preemption,"

and noted that "[t]he First Circuit recently rejected the Commissioner's interpretation in *Securities Indus. Ass'n v. Connolly*, 883 F.2d 1114, 1123–24 (1st Cir. 1989)." Very recently, a federal district court in this circuit reached the same conclusion, writing that "in the absence of any congressional command" to the contrary, the FAA bars not only "a rule prohibiting enforcement of existing agreements," but also a rule "prohibiting new arbitration agreements." Mem. and Order at 28, *Assoc. Builders & Contractors of Se. Tex. v. Rung*, No. 16-cv-00425 (E.D. Tex. Oct. 24, 2016).

This authority aside, there is something fundamentally illogical about the notion that, while grave FAA concerns would be raised if CMS invalidated a single clause in a single arbitration contract, no such concerns are raised by a Rule which might conceivably prevent nursing homes from executing *millions* of arbitration contracts with their residents. This court frankly doubts that this will be held to be the law. In arguing otherwise, defendants note that the U.S. Supreme Court has written that the Federal Arbitration Act "does not confer a right to compel arbitration of any dispute at any time" and "does not require parties to arbitrate when they have not agreed to do so . . . . It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474-75, 478 (1989). In writing these words in *Volt*, however, the Supreme Court was dealing with an agreement between private parties, and it further found that those parties "had agreed that arbitration would not proceed in situations" which were present in that case. *Volt*, 489 U.S. at 475. The Supreme Court thus appeared to conclude that it was enforcing the contracting parties' intent. This bears no resemblance to the *de facto* banning of an entire form of arbitration by a federal agency, over the

vigorous opposition of one of the affected groups.

Neither side cites a single decision which clearly establishes that it is likely to prevail in this case. However, it is apparent that plaintiffs have managed to bring forth a considerably greater amount of helpful authority. It is no doubt true that every decision relied upon by plaintiffs can be distinguished from this case in one or more important ways. Nevertheless, this court believes that the cumulative effect of these decisions makes it unlikely, particularly in light of the rather sparse administrative record, that CMS will be found to have offered sufficient justification for banning nursing home arbitration.

The decisions relied upon by plaintiffs present significant legal hurdles for defendants. While this court cannot say with any high degree of confidence that the Rule will fall victim to a particular legal maxim, the overall state of authority in this context makes it seem unlikely that defendants will prevail. One decision relied upon by plaintiffs is the U.S. Supreme Court's decision in *AT&T Mobility v. Concepcion*, 563 U.S. 333 (2011). In *Concepcion*, the Supreme Court overturned a California Supreme Court decision which had held as unconscionable under California law a provision in an arbitration contract which required customers to submit disputes to individual arbitration rather than filing class action lawsuits. In so holding, the U.S. Supreme Court wrote that "[a]lthough § 2's saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives." *Concepcion*, 563 U.S. at 343.

The Supreme Court concluded in *Concepcion* that, even though unconscionability was a generally applicable defense, the California Supreme Court's decision did, in fact, stand as such an obstacle to arbitration. *Concepcion* did not involve an action by a federal agency, and there

are a number of other facts which distinguish it from this case in important ways. Nevertheless, the Supreme Court made a number of statements in *Concepcion* helpful to plaintiffs in this case. The Supreme Court stated, for example, that "our cases place it beyond dispute that the FAA was designed to promote arbitration." *Concepcion*, 563 U.S. at 345. Moreover, the Supreme Court held the California rule invalid because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* In this court's view, *Concepcion*'s generalized statement that the FAA was "designed to promote arbitration" and its ruling on the basis of the "objectives of Congress" makes it seem likely that the Supreme Court would provide some significant degree of scrutiny to CMS' decision to ban a particular form of arbitration, even if that ban did not affect existing contracts.

Plaintiffs also rely upon *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012), in particular its statement that the FAA's mandate that arbitration agreements be "enforce[d] * * * according to their terms" can be displaced only by a "contrary congressional command" in another statute. In response, defendants argue that the fact that Medicare and Medicaid participation is "voluntary" renders the *CompuCredit* analysis inapplicable:

> A nursing home's participation in these programs is entirely voluntary, and the Secretary is fully empowered to impose reasonable conditions on that participation. *See, e.g.*, *Burditt v. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991). Conversely, a nursing home that does not participate in Medicare or Medicaid is not subject to the regulation. There is, therefore, no conflict between the FAA and the Medicare and Medicaid statutes that would require any analysis regarding whether the latter statutes "override" the former, under cases such as *CompuCredit*.

[Defendants' brief at 20]. In their rebuttal brief, plaintiffs maintain that this argument is non-responsive, writing that "[t]he government does not even *attempt* to show that the Medicare and

Medicaid Acts contain the 'contrary congressional command' (*CompuCredit*) required for another federal statute to override the FAA—because there is no credible argument that the test is met here." [Rebuttal brief at 1-2]. This motion for preliminary injunction is not the proper occasion for this court to make a definitive choice between these competing arguments, but it does seem clear that *CompuCredit* presents further significant difficulties for defendants.

Another adverse decision confronting defendants in this case is the Fifth Circuit's decision in *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 360-62 (5th Cir. 2013). In *D.R. Horton*, a divided Fifth Circuit panel concluded that the National Labor Relations Board had acted contrary to the FAA when it ruled that an arbitration provision in an employment contract interfered with employees' rights under the National Labor Relations Act ("NLRA"). *Id.* at 362. In so ruling, the Fifth Circuit first noted that:

> We start with the requirement under the FAA that arbitration agreements must be enforced according to their terms. Two exceptions to this rule are at issue here: (1) an arbitration agreement may be invalidated on any ground that would invalidate a contract under the FAA's "saving clause," and (2) application of the FAA may be precluded by another statute's contrary congressional command."

*D.R. Horton*, 737 F.3d at 358. In concluding that the Board had failed to give adequate consideration to the FAA's pro-arbitration policy, the Fifth Circuit wrote that:

> the Board has not shown that the NLRA's language, legislative history, or purpose support finding the necessary congressional command. Because the Board's interpretation does not fall within the FAA's "saving clause," and because the NLRA does not contain a congressional command exempting the statute from application of the FAA, the Mutual Arbitration Agreement must be enforced according to its terms.

*Id.* at 362. In *D.R. Horton*, the NLRB refused to apply a provision in an *existing* arbitration agreement, and this is an important distinguishing factor. Nevertheless, *D.R. Horton* does appear

to advance plaintiffs' arguments in this case, since it involved the application of the FAA's policy provisions to a federal agency. This court regards this fact as significant, since it suggests that the same pro-arbitration FAA policies which the Supreme Court has applied to private parties and states likewise apply to federal agencies.

In enacting the Rule in this case, CMS relied heavily upon the disparity in bargaining power and procedural unfairness which, it contended, were inherent in the nursing home admissions process. In the court's view, these stated bases for banning arbitration are problematic in light of the Supreme Court's 2013 decision in *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309, 186 L. Ed. 2d 417 (2013). In *Italian Colors* (as previously in *Concepcion*), the Supreme Court was unpersuaded by arguments that alleged unfairness in the arbitration process overrode the FAA's pro-arbitration policies, and it seems quite possible that it would be unpersuaded by the unfairness described in the administrative record in this case. *Italian Colors* (like *Concepcion*) involved a sharply divided Supreme Court, and it is not clear how broadly the current Court would apply the decision, but it clearly represents adverse authority for defendants in this case.

While plaintiffs are thus able to rely upon a considerable amount of authority in this case, this court's conclusion that they are likely to prevail has as much to do with the state of the administrative record as it does with the bolus of authorities presented. In reading the record, this court does not get the impression that CMS appreciated the gravity of an attempt to ban an entire form of arbitration, nor does it appear that the agency made the requisite efforts to actually *prove* that nursing home arbitration had the sort of negative effects which it quoted various commenters as *saying* it had. In the court's view, accumulating and reading from public

comments is a questionable method of proving *anything*, and yet most of CMS' rationalization for banning arbitration was based on such comments, often from interested parties. Even assuming this is how CMS ordinarily conducts its business, a rule banning nursing home arbitration is not ordinary CMS business (assuming it has the authority to take this action at all). In the court's view, it would have been far preferable for an agency with the resources of CMS to conduct its own independent and reliable investigation of issues relating to nursing home arbitration, in order to justify a step which, it must have known, would raise serious concerns in light of the FAA.

The state of the law in this context is less than clear, but it seems likely that the U.S. Supreme Court would require a federal agency applying a generalized statutory mandate to, at a minimum, demonstrate a strong basis in fact for concluding that a particular form of arbitration should be effectively banned. This court does not believe that CMS created such a strong factual record in enacting the Rule, even though, in the court's view, it potentially could have. In particular, this court believes that, if CMS had singled out the mental competency issue discussed in section I for special attention, then it might have used that as a possible justification for distinguishing nursing home arbitration contracts from other arbitration contracts, thus harmonizing the Rule with the FAA.[2] CMS gave no special attention to this issue in its

---

[2] In the court's view, the facts that 1) more than half of nursing home patients have been diagnosed with Alzheimer's or some other form of dementia at the time of admission (and many others presumably have some lesser degree of mental incapacity); 2) the laws of every state require that individuals have mental competency to enter into contracts; and 3) the FAA specifically preserves generally-applicable contract defenses (of which lack of mental competency is likely the most well-established) make nursing home arbitration fundamentally different from other major types of arbitration and provides a basis for the Rule to be reconciled with the FAA. Indeed, if the FAA allows the defense of mental incompetency to negate an arbitration agreement in an *individual* case, as it clearly does, then it should seemingly not violate

comments, however, and it certainly did not document the sort of administrative record which would support using this issue as a basis for an effective ban on nursing home arbitration contracts.

In light of the foregoing, it seems likely to this court that CMS will ultimately be held to have presented insufficient justification for banning nursing home arbitration in this case, even assuming (as is far from clear) that it might have demonstrated a right to take such a step under any scenario. This court therefore concludes that the first preliminary injunction factor favors plaintiffs on the FAA issue, and it now turns to the question of whether the Medicare or Medicaid Act gave CMS authority to enact the Rule.


## II. Likelihood of Success (b) Does Either the Medicare Act Or The Medicaid Act Give CMS The Authority To Prohibit Arbitration In The Long-Term Care Industry?

This court now turns to the issue of CMS' statutory authority to enact the Rule. It should be emphasized that "public policy" *per se* plays no role in this court's analysis of this issue, except insofar as the same factors which relate to public policy may also relate to the statutory mandate given to CMS by Congress. Indeed, a federal agency might wish to enact the most beneficial rule imaginable, and yet, if it lacked the authority to do so, then the rule could not be upheld. Thus, even if this court could consider its own views and experiences with regard to nursing home arbitration litigation in this case (which, once again, it cannot) then those views

---

the spirit of the FAA to greatly limit arbitration's use in a context where there are *systemic* problems with lack of mental competency. It should be noted, however, that while such a showing might ease any FAA concerns, it would not resolve the statutory authority issues discussed below.

would not impact its analysis at this point.  Indeed, it should be apparent that, if authority is created authorizing an agency to enact a positive rule, then that same authority may later be used to enact a harmful rule.  While there is undoubtedly a great deal of Congressional gridlock, Congress' failure to enact positive legislation should not serve as an excuse for the executive branch to assume powers which are properly reserved for the legislative branch.  It appears to this court that the Rule enacted by CMS in this case crosses the line.

Defendants argue that the Rule was validly enacted based partly upon Congress's authorization for the Secretary to impose "such other requirements relating to the health and safety [and the well-being] of residents . . . as [she] may find necessary," 42 U.S.C. §§ 1395i-3(d)(4)(B), 1396r(d)(4)(B), and to establish "other right[s]" to "protect and promote the rights of each resident," in addition to those expressly set forth in the statutes and regulations. *Id*. §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi).[3]  Certainly, this language is broad, but it is also quite vague.  That being the case, this court sees a serious danger that, if generalized language regarding "protecting [resident] health and safety" were deemed sufficient to authorize a ban on arbitration agreements in nursing home cases, then many other agencies would choose to broadly exert power in a variety of contexts.  While this court is sympathetic to the public policy considerations behind the Rule, it places even greater importance upon the basic separation of powers principles set forth the U.S. Constitution.

---

[3]Defendants maintain that the Rule also falls within the Secretary's general statutory authorities to enact "regulations, not inconsistent with [the Social Security Act], as may be necessary to the efficient administration of the functions with which [she] is charged under [the Act]," 42 U.S.C. § 1302(a), and, more specifically, to "prescribe such regulations as may be necessary to carry out the administration of the [Medicare program]," *id*. § 1395hh(a).  Defendants provide few arguments in this context, however, and this court believes that this provision constitutes the weakest of the stated bases for CMS's adoption of the Rule.

In their brief, plaintiffs note that Congress specifically considered, yet declined to adopt, legislation which would have done essentially the same thing as the Rule in this case. Plaintiffs note, for example, that:

> [I]n 2008, the House of Representatives considered the Fairness in Nursing Home Arbitration Act of 2008, H.R. 6126, 110th Cong. That proposed legislation would have amended the FAA to expressly provide that pre-dispute arbitration agreements between SNFs/NFs and their residents "shall not be valid or specifically enforceable." *Id.* § 2(a). House Bill 6126 received a formal committee hearing, *see Fairness in Nursing Home Arbitration Act of 2008: Hearing Before the Subcomm. on Commercial & Admin. Law of the House Comm. on the Judiciary*, 110th Cong. (2008), and was reported out of committee with dissenting views, *see* H.R. Rep. No. 110-894 (2008). However, the bill failed to obtain a vote by the full House of Representatives or the Senate.

[Complaint at 8]. After citing other occasions where Congress considered banning nursing home arbitration provisions but declined to do so, plaintiffs argue that:

> 27. In short, Congress has thoroughly—and repeatedly—considered whether to regulate or prohibit the use of arbitration agreements between SNFs/NFs and their residents, and each time, Congress has rejected the proposal. Yet the Secretary and the Acting Administrator have enacted an Arbitration Rule imposing the very proposed ban on arbitration agreements that Congress has consistently refused to enact.

[Complaint at 9].

In their brief, defendants do provide a substantial response to this argument, writing that:

> *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1342 (D.C. Cir. 1998) ("Congress does not express its intent by a failure to legislate."). The Supreme Court has observed that "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction . . . ." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks omitted). For example, "[c]ongressional inaction frequently betokens unawareness, preoccupation, or paralysis." *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969).

[Defs' brief at 21].

Defendants' arguments on this issue raise valid points, but this court does not believe that it is precluded from considering the legislative history cited by plaintiffs. Indeed, this court's reading of *Pension Ben. Guar. Corp.* and similar cases indicates that courts should *exercise caution* in inferring intent from Congressional inaction, since a failure to enact a law constitutes "a particularly dangerous ground on which to rest an interpretation of a prior statute." 496 U.S. at 650. In light of this admonition, this court will not place excessive weight upon the fact that Congress repeatedly rejected bills similar in effect to the Rule, but it is not required to ignore this fact either. In this case, plaintiffs' legislative history argument strikes this court as being particularly strong, and this history certainly seems relevant in determining whether a federal agency which asserts extraordinarily broad powers, pursuant to a vague statutory mandate, actually had the authority it claims to have had.

Rendering the legislative history relied upon by plaintiffs even stronger is the fact that Congress has, in fact, expressly granted certain federal agencies the authority to regulate or prohibit the use of arbitration agreements, and it has done so with clear and direct language. For example, Section 1028 of the Dodd-Frank Wall Street Reform and Consumer Protection Act provides that, if certain conditions are met, the Consumer Financial Protection Bureau "may prohibit or impose conditions or limitations on the use of an agreement between a covered person and a consumer for a consumer financial product or service providing for arbitration of any future dispute between the parties[.]" 12 U.S.C. § 5518(b); *see also*, *e.g.*, 15 U.S.C. § 78o(o) (authorizing the Securities and Exchange Commission to, "by rule, * * * prohibit, or impose conditions or limitations on the use of, agreements that require customers or clients of any broker, dealer, or municipal securities dealer to arbitrate any future dispute between them arising

under the Federal securities laws").  Thus, Congress has made it clear that it knows how to grant

a federal agency the authority to limit arbitration agreements, and it has done so with plain and

unambiguous language.  This causes this court to regard CMS' argument that certain vague

language in its own enabling legislation has the same effect with considerable skepticism.

In the court's view, defendants actually buttress the relevance of the above legislative

history through their statement that "[a]mong other comments, CMS received several items of

correspondence from members of Congress and other public officials, including a letter from

thirty-four Senators urging the agency to prohibit pre-dispute arbitration agreements."

[Defendants' brief at 9].  In the court's view, the fact that thirty-four U.S. Senators wrote CMS

urging that it adopt the Rule increases, not decreases, the separation of powers concerns in this

context.  A view expressed by thirty-four Senators is, obviously, a minority view which is

incapable of becoming law.  The fact that those Senators urged CMS to adopt the Rule raises

concerns in this court's mind that they were attempting to accomplish by agency *fiat* what they

could not accomplish through the legislative process, namely abolish nursing home arbitration.

However much sympathy this court might have with the public policy considerations which

motivated that desire, the basic concept of separation of powers is far more fundamental and

important than the pending arbitration issue.

Returning to the issue of CMS's statutory authority, neither side cites precedent which

establishes whether a generalized mandate such as that enjoyed by the agency to promote resident

"health" and "safety" encompasses the power to ban nursing home arbitration agreements.  It

appears that this case may well make "new law" on this point.   For its part, this court believes

that an appellate court may be hesitant to make a categorical holding that CMS could never bar

nursing home arbitration contracts, no matter what facts it could present in support of such a decision. Indeed, in the context of Constitutional rights, courts generally do not bar governmental entities outright from taking particular actions, but, rather, require that those actions be supported by sufficiently strong reasons. There are good reasons behind this approach, since it is difficult for courts to envision all facts that might come before a particular entity. This court suspects that appellate courts might take a similar approach in this context, and if so, it doubts that the administrative record in this case will be held sufficiently strong to justify CMS's action.

In arguing that the record in this case does, in fact, support adoption of the Rule, defendants write that:

> In promulgating 42 C.F.R. § 483.70(n)(1), CMS found that pre-dispute arbitration agreements "could be detrimental to residents' health and safety," 80 Fed. Reg. at 42,211, and that finding is amply supported by the comments and other information before the agency. That information indicated, for example, that such agreements are normally presented upon admission, which is "an extremely stressful time for the [prospective] resident and his or her family," especially given that the resident "may have a serious injury, surgery, or illness." 81 Fed. Reg. at 68,796. This seriously compromises the ability of the resident or the resident's family to make the best decision for his/her health, safety, and well-being. Additionally, the agency found that arbitration agreements usually contain confidentiality provisions, which "may create barriers for surveyors and other responsible parties to obtain information related to serious quality of care issues," 80 Fed. Reg. at 42,211 – further affecting the health, safety, and well-being of residents. Thus, 42 C.F.R. § 483.70(n)(1) falls within the Secretary's authority to impose "other requirements relating to the health and safety [and the well-being] of residents . . . as [she] may find necessary," 42 U.S.C. §§ 1395i-3(d)(4)(B), 1396r(d)(4)(B).

[Defendants' brief at 14]. CMS cited other similar views in its comments to the Rule, and its position is not without logical appeal. This court is unable to regard the administrative record in this case as a strong one, however, since CMS's comments consist, in large part, of its discussion

of views sent in by interested parties, as supplemented by a handful of court decisions and law journal articles. CMS does not appear to have conducted its own independent study of whether arbitration agreements harm resident health. Such a study would clearly be helpful in this context.

Weaknesses in its methodology aside, this court does not believe that CMS focused nearly enough on the statutory mandate which it has to fulfill and which serves as its only arguable basis for banning nursing home arbitration. As quoted above, for example, CMS relied heavily upon the fact that the admissions process is "an extremely stressful time for the [prospective] resident and his or her family," but this court does not believe that it had much success in tying this stress, in a practical way, to negative health and safety effects impacting residents. For example, this court regards the notion that being asked to sign arbitration agreements during a stressful admissions process will cause residents to make incorrect health care decisions or that the agreements will reduce the flow of "information related to serious quality of care issues" as being quite speculative assertions which are unsupported by objective proof. It is also not clear to this court that, even if these effects were reliably proven, they would be considered sufficiently important to ban the practice of nursing home arbitration entirely.

Having said that, this court does agree with defendants that the practice of executing arbitration contracts during the nursing home admissions process raises valid concerns, on a public policy level, since many residents and their relatives are "at wit's end" and prepared to sign anything to gain admission. This court believes that Congress might very reasonably conclude that this fact, along with the inefficiencies in nursing home arbitration discussed in section I, support doing away with this form of arbitration. The problem in this case is that CMS

does not have the authority to ban nursing home arbitration on general policy grounds. Moreover, CMS' efforts to tie its arbitration ban to the limited authority it does have strike this court as being rather forced. This court thus recognizes the importance of the issues CMS raises, but they can only be regarded as ones involving resident "health, safety and welfare" under an exceedingly broad understanding of agency authority. This court cannot, of course, rule out the possibility that an exceedingly broad understanding of agency authority will ultimately prevail in this case, but it does not regard this result as likely.

This court believes that, in the next portion of their brief, defendants essentially put their cards on the table and accurately describe the power they are asking to be given in this case. Moving on from their argument that the Rule promotes resident "health" and "safety," defendants next argue that CMS' statutory authority to establish and protect resident "rights" encompasses the Rule in this case, writing that:

> CMS's findings also fully support its conclusion that a right to avoid pre-dispute arbitration agreements will "protect and promote the rights of each resident." §§ 1395i-3(c)(1)(A)(xi), 1396r(c)(1)(A)(xi). Much of the material before the agency attested to the "superior bargaining power" of LTC facilities compared to residents, which "could result in a resident feeling coerced into signing the agreement. Some commenters, including a member of Congress, observed that a person being admitted to a nursing home would be unlikely "to fully understand the gravity of contract terms and their legal rights . . . concerning potential future disputes between themselves and the facilities." In light of these circumstances and others considered by the agency, establishing a right for residents to avoid pre-dispute arbitration agreements falls well within the Secretary's authority to establish "other right[s]" to "protect and promote the rights of each resident."

> Moreover, as discussed above, Congress authorized the Secretary to impose "other requirements" and to establish "other rights," because of its concern that "vulnerable elderly and disabled beneficiaries" were receiving "poor quality care" in nursing homes. The Secretary promulgated 42 C.F.R. § 483.70(n)(1) precisely to protect "vulnerable" Medicare and Medicaid beneficiaries and to ensure that they receive "quality care." If the Secretary's

statutory authority to impose "other requirements" and to establish "other rights" means anything, it encompasses the regulation challenged here.

[Defendants' brief at 14-15]. Defendants further argue, with considerable candor, that in deciding whether the vague language quoted above grants CMS the authority to ban nursing home arbitration, the federal courts should defer to its conclusion that it does. Specifically, defendants write that:

> Even if there were any uncertainty as to whether these statutory authorities include the power to prohibit pre-dispute arbitration agreements, the Court should defer to the Secretary's conclusion that they do. As noted above, the Secretary of Health and Human Services and the Administrator of CMS are entrusted with administering the Social Security Act and its Medicare and Medicaid provisions. And Congress particularly granted the Secretary broad authority to impose additional requirements on nursing homes that participate in Medicare or Medicaid to protect the rights of residents.

[Defendants' brief at 16].

Of the stated bases for enacting the Rule in this case, defendants' citation of their authority to "protect and promote the rights of each resident" and to establish "other rights" arguably has the strongest basis in statutory language, since the Rule can, in fact, reasonably be regarded as establishing important rights on behalf of nursing home residents. It should also be clear, however, that seeking to ban nursing home arbitration agreements on the basis of extremely vague language such as this represents a breathtakingly broad assertion of authority by a federal agency. It strikes this court that most enactments can be said to establish "rights" of some sort, and if mandates of the sort quoted above were deemed sufficient to authorize them, then agency power would likely grow exponentially. In its *amicus* brief, the Chamber of Commerce cites a number of other federal agencies which have vague statutory mandates similar to the ones enjoyed by CMS, and it seems likely that upholding the Rule in this case would open

the door to similarly broad assertions of agency power in other contexts. As if to confirm that they are, in fact, seeking such a broad grant of agency power, defendants expressly request that this court defer to the HHS Secretary's understanding of her authority. For its part, however, this court believes that this case raises serious separation of powers concerns and that the federal courts have a duty to ensure that defendants are not seeking to exercise power that is properly reserved for Congress.

In the court's view, CMS's statutory authority to establish "rights" on behalf of residents is simply too vague and tenuous a grant of authority to justify the Rule in this case. This court is of the view that CMS' only arguable basis for banning nursing home arbitration is if it can be demonstrated that this form of arbitration is so flawed that it negatively impacts residents' "health, safety and welfare." Moreover, this court believes that CMS would be required to actually *prove* that this negative impact is occurring, with proof considerably more reliable than comments received from the public. Empirical evidence, rather than anecdotes, may (or may not) establish that a greater good is served by arbitration in most cases. The record established by CMS in this case may well be sufficient for ordinary agency business, but the agency is seeking to engage in a rather unprecedented exercise of agency power in this case. This court believes that more is required to justify the Rule in this case.

While CMS may find it difficult to demonstrate a factual basis for its authority to ban nursing home arbitration, this court does not believe that this is an issue where the courts can allow an agency to take shortcuts. Indeed, if the statutory boundaries of agency authority are not rigorously enforced by the courts, then it seems likely that federal agency power will, inevitably, grow beyond that envisioned by the U.S. Constitution. It thus seems likely to this court that an

appellate court will conclude that, when extraordinary authority is sought by an agency, it should provide an extraordinary (or at least a quite strong) showing of need for it to exercise such authority. This court does not see a strong showing of need in the administrative record in this case, and it therefore considers it unlikely that CMS will be held to have properly exercised its authority in deciding to ban nursing home arbitration in this case.

## II. Likelihood of Success (c) Is the Arbitration Ban Arbitrary and Capricious?

Did CMS act arbitrarily and capriciously in enacting the Rule in this case? This case is very unlikely to turn on this particular issue. Indeed, it is difficult to imagine any court concluding that the Rule in this case fell within CMS's statutory power to promote the "the health, safety, and well-being of residents," further conclude that the Rule was supported by sufficiently important considerations to override the FAA's pro-arbitration policy, and yet nevertheless conclude that CMS acted arbitrarily and capriciously in enacting the Rule. Defendants face a much more difficult obstacle with regard to the FAA and statutory authority issues, and this court will accordingly not discuss this issue in as much depth.

In considering this issue, this court will not, in effect, count the statutory authority issue twice, since this is the third alternative argument raised by plaintiffs in support of the Rule being set side. This court has already found that plaintiffs are likely to prevail on two of them. For the purposes of this issue, however, this court will assume that the Rule does not contravene the FAA and that it fell within CMS's statutory authority to promote resident health and welfare. With these assumptions, this court does not believe that CMS's action can validly be

characterized as arbitrary or capricious.

In so concluding, the court notes that, while it does not view the administrative record in this case as being particularly strong, it does regard it as being more than sufficient to survive scrutiny under the highly deferential "arbitrary and capricious" standard. In arguing otherwise, plaintiffs note that CMS changed its prior stated position on this issue, which was to not oppose nursing home arbitration contracts. While a relevant factor, this court regards this as insufficient to demonstrate that the agency acted arbitrarily or capriciously in changing its mind in this regard. This court finds the other arguments raised in plaintiffs' brief on this issue to be similarly unavailing, and it therefore concludes that, in the unlikely event that this issue does become relevant in this case, defendants will likely succeed on it.

**II. Likelihood of Success (d) Does the Arbitration Ban Violate the Regulatory Flexibility Act?**

Have plaintiffs demonstrated a likelihood that they will succeed on their argument that the Rule violates the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq*? The RFA requires agency rules to contain a "regulatory flexibility analysis"—"a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(a)(6). The agency may omit this analysis if "the head of the agency

certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." *Id.* § 605(b).

In enacting the Rule in this case, the Secretary did, in fact, certify that no regulatory flexibility analysis was needed. 81 Fed. Reg. at 68,846. CMS and HHS asserted that they had calculated the costs of complying with the entire regulation containing the Arbitration Rule and determined that the average impact would amount to "less than 1 percent" of a nursing home's revenue. *Id.* In their brief, plaintiffs argue that

> [c]ritically, while the certification assigned costs to *other* sections of the regulation, it ignored the costs of the *Arbitration Rule*. *Id.* at 68,844. The agencies thus failed to comply with the RFA. There can be no dispute that the Arbitration Rule *will* impose significant costs on SNFs/NFs by requiring them to resolve disputes more expensively in court, raising their insurance premiums, and forcing them to change their internal procedures to comply with the ban. CMS and HHS should have acknowledged these costs and assessed whether they would have a "significant economic impact" on SNFs/NFs. The agencies' failure to do so violated the RFA, and therefore, under the APA, the Arbitration Rule should be vacated in its entirety.

[Plaintiffs' brief at 19].

This court acknowledges the coherence of these arguments; however, plaintiffs have failed to demonstrate a likelihood of prevailing on this issue. In so concluding, this court notes that, as defendants argue in their brief, the RFA "is a procedural rather than substantive agency mandate," prescribing no specific outcome and imposing no requirement that an agency adopt substantive measures to reduce the impact of regulations on small business. *See Ass'n of Am. Physicians & Surgeons, Inc. v. HHS*, 224 F. Supp. 2d 1115, 1128 (S.D. Tex. 2002). A court reviews agency compliance with the RFA "only to determine whether an agency has made a reasonable, good-faith effort to carry out [the statute's] mandate." *Alenco Commc'ns, Inc. v.*

*FCC*, 201 F.3d 608, 625 (5th Cir. 2000) (internal quotation marks omitted). The court's review

of an agency's certification under 5 U.S.C. § 604(b) is "highly deferential, 'particularly . . . with

regard to an agency's predictive judgments about the likely economic effects of a rule.'"

*Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 432-33 (D.C. Cir. 2013) (quoting *Nat'l Tel.*

*Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009)).

Based on this authority, defendants argue in their brief that:

> Here, in both the proposed rule and the final rule, the Secretary engaged in
> a detailed Regulatory Impact Analysis under Executive Orders 12,866 and 13,563
> – covering six pages of the proposed rule and ten and one-half pages of the final
> rule. *See* 80 Fed. Reg. at 42,235-240; 81 Fed. Reg. at 68,836-946. That analysis
> included a lengthy, detailed discussion of the costs associated with the final rule.
> *Id*. at 68,838-844. Turning to the Regulatory Flexibility Act in the final rule, the
> Secretary referred to the Regulatory Impact Analysis and certified that the final
> rule would "not have a significant economic impact on a substantial number of
> small entities." *Id*. at 68,846. With this certification, the Secretary fully discharged
> her obligations under the RFA, and this Court's inquiry is at an end. *See* 5 U.S.C.
> § 605(b). Although plaintiffs may disagree with the Secretary's analysis or wish it
> had been more detailed, that does not make out a violation of the RFA. In
> reviewing a challenge under the RFA, "[t]he proper question . . . is not whether
> the [agency] reached the 'correct' determination, but whether the agency followed
> the procedural steps set out in the RFA."

[Defendants' brief at 25-26 (citations omitted)].

For the purposes of the preliminary injunction motion, this court believes that defendants'

brief, which is supported by far more authority than plaintiffs' brief, has the better of the

arguments on this issue. This court acknowledges that it has no prior experience in interpreting

the RFA, and it does not exclude the possibility that its initial conclusion in this regard will later

change. In ruling upon the preliminary injunction motion, however, this court is necessarily

forced to make a quick evaluation of these issues, and, having done so, finds that plaintiffs have

failed to demonstrate a likelihood of succeeding on this issue. This court emphasizes, however,

that this does not mean that defendants prevail on the overall likelihood of success issue since this argument is merely an alternative means by which plaintiffs seek to have the Rule in this case held invalid. With that caveat, this court now turns to the next preliminary injunction factor.

### III. Will Plaintiffs suffer Irreparable Harm Without Injunctive Relief?

This court now turns to the second preliminary injunction factor, namely that of irreparable harm. The U.S. Supreme Court has stated that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original). The Fifth Circuit has similarly written that "[t]here must be a *likelihood* that irreparable harm will occur. Speculative injury is not sufficient . . . ." *Morrell v. City of Shreveport*, 536 F. App'x 433, 435 (5th Cir. 2013)(emphasis in original).

In this case, this court considers it virtually certain that plaintiffs will, in fact, suffer at least some irreparable harm if the Rule goes into effect on November 28 and is later held unlawful. Indeed, it is difficult to imagine that a Rule requiring nursing homes across the country to change their business practices in important ways would *not* produce at least some harmful effects which are incapable of being remedied after the fact.

In arguing that irreparable harm has not been demonstrated, defendants contend that *some* of the injuries cited by plaintiffs in their brief are speculative and unlikely to occur. While this may be true, it seems virtually certain that a significant amount of irreparable harm will, in fact,

occur. On the most obvious level, nursing homes will lose signatures on arbitration contracts which they will likely never regain. Moreover, this court agrees with plaintiffs that "provider Plaintiffs and other SNFs/NFs would incur immediate, substantial administrative expenses. Admission agreements would need to be revised, and staff would require retraining on admissions and dispute-resolution procedures." While one can quibble with some of the expenses and harms cited by plaintiffs in their brief, this court believes that this factor clearly favors them.

**IV. Does the threatened injury if the injunction is denied outweigh any harm that will result if the injunction is granted?**

The court now turns to the third preliminary injunction factor, which asks whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted. Based upon the administrative record in this case, this court finds that the third preliminary injunction factor supports plaintiffs' position. In their brief, plaintiffs offer the following arguments on this issue:

> The Arbitration Rule violates the FAA and exceeds the agencies' statutory authority, and "[t]here is no harm in delaying implementation of an invalid rule." *Perez*, 2016 WL 3766121, at *45; *see also*, *e.g.*, *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080, 1085 (11th Cir. 2013) ("DOL argues that it is harmed by having 'its entire regulatory program called into question.' This is not an appealing argument. If the 'entire regulatory program' is *ultra vires*, then it should be called into question.").

> And in any event, there would be no harm to Defendants from staying the Rule's ban on arbitration, even if it were ultimately found lawful. As explained above, CMS and HHS have long permitted the use of arbitration in the long-term care profession. *See* pp. 3-4, *supra*. Thus, "[a] preliminary injunction would merely maintain the status quo that has been in place" until the merits of the Arbitration

Rule can be definitively adjudicated. *Perez*, 2016 WL 3766121, at *45.

[Plaintiffs' brief at 22-23].  This court agrees.

It should be emphasized that, in discussing the third and (very similar) fourth preliminary injunction factors, this court is balancing harms and considering the public interest in the context of the *preliminary injunction motion*.  In the preliminary injunction context, the balance of the harms and the public interest are determined in terms of whether it would be better to give the courts an opportunity to consider the merits of a Rule which sharply alters the pre-existing status quo, before it goes into effect.  In this vein, this court believes that CMS' position on the third and fourth preliminary injunction factors is significantly weakened by the fact that, until recently, it declined to oppose nursing home arbitration as a matter of agency policy.  As stated previously, this court does not believe that the fact that CMS changed its position in this regard renders the Rule arbitrary and capricious.  This court does believe, however, that CMS' change in position weakens its argument that it has now realized that nursing home arbitration is harmful and that its new Rule must go into effect *right now*.

In arguing to the contrary, defendants write that:

> Plaintiffs' speculations of harm contrast sharply with the Secretary's findings regarding the impact of pre-dispute arbitration agreements on residents, which are based on almost 1,000 comments from the public, a review of relevant literature, and communications from members of Congress. 81 Fed. Reg. at 68,790, 68,793, 68,799. Nursing home residents, many of whom are frail, elderly, and/or disabled, must enter into these agreements at an "extremely stressful" time and without adequate information. *Id*. at 68,790, 68,793, 68,796. The agreements purport to bind them to one means of resolving any future dispute with the facility, before they can know the nature or seriousness of the dispute. *Id*. at 68,790, 68,792, 68,793.

> Plaintiffs themselves assert that "[a] million or more new residents and patients" will probably be admitted to LTC facilities under Medicare or Medicaid

during the pendency of this action (Doc. 21 at 20). If the requested preliminary injunction were granted, all or nearly all of those residents would probably enter into pre-dispute arbitration agreements as a condition of admission. They would then be bound to that one means of resolving any dispute with their nursing home, not only for the duration of this litigation, but also for the duration of their stay and "some for the rest of their lives." 81 Fed. Reg. at 68,792. This consequence for "a million or more" individuals and their families clearly outweighs any contrary speculative harm to the plaintiffs.

[Defendants' brief at 29-30].

It should be clear from section I that this court agrees with defendants on many of the policy issues relating to nursing home arbitration, even though it believes that CMS should have taken a much more reliable and thorough approach to documenting its concerns in this area, particularly where relevant to establishing its authority to correct them. In deciding these preliminary injunction issues, however, this court is dealing with a Rule which changes a practice that CMS accepted for many years. Thus, even if this court were to accept the rather anecdotal evidence quoted above as sufficient proof of "harm," it does not believe that defendants are entitled, in the context of this preliminary injunction motion, to have those harms "balanced" in the manner they seek.

In the court's view, CMS might easily have quoted very similar descriptions of deficiencies in nursing home arbitration years ago when it accepted the practice. And yet it fails to offer an adequate explanation as to why the Rule addressing its newfound concerns on this issue must go into effect immediately. This court therefore does not regard defendants' arguments quoted above (which represent their entire arguments on this issue) as providing sufficient reason for preventing the courts from making a careful evaluation of the Rule before it goes into effect. This court believes that defendants are in a particularly poor position to expect

the Rule in this case to go into effect immediately, considering that, in using vague language in its enabling legislation to ban arbitration contracts, CMS is attempting to do something quite unprecedented. In the court's view, a federal agency which seeks to use its authority in an unprecedented manner to enact a Rule which raises serious concerns under both the FAA and under general separation of powers principles should reasonably expect the courts to carefully examine it before it goes into effect.

Also relevant to both the third and fourth factors are the facts that, as noted previously, Congress repeatedly failed to enact proposed legislation similar in effect to the Rule, and thirty-four U.S. Senators wrote to CMS asking that it take the action it did. These facts, along with the sheer breadth of the Rule, raise concerns in this court's mind that this case involves an attempted expansion of federal agency power in such a manner as to raise separation of powers concerns. This court frankly believes that these issues are even more important than the arbitration issues, and the potential that the Rule might serve to violate the basic separation of powers principles in the U.S. Constitution seems a quite relevant factor in deciding whether to allow the federal courts to resolve any concerns in this regard before allowing it to go into effect. This court therefore concludes that the balance of harms supports granting the preliminary injunction.

**IV. Will the grant of an injunction disserve the public interest?**

In the court's view, the inquiry under the fourth preliminary injunction factor is very similar to that applicable to the third in this case, and it believes that a similar analysis as that stated above applies here. With regard to this issue, plaintiffs argue in their brief as follows:

No countervailing public interest weighs against injunctive relief. If the Arbitration Rule were upheld, it could go into full effect at the conclusion of this case. And CMS and HHS cannot point to any urgent reason why its arbitration ban must go into effect immediately. Moreover, if any particular arbitration agreement actually is unfair, it can be invalidated under normal unconscionability principles. *Marmet*, 132 S. Ct. at1203. In sum, the case for a preliminary injunction here is compelling—and the case against one is nonexistent.

[Defendants' brief at 23]. For its part, this court would not characterize defendants' case on the fourth preliminary injunction factor as "non-existent," but it does agree with plaintiffs that defendants have failed to sufficiently make a case that the public interest requires the Rule to go into effect on November 28, 2016. Given that the fourth factor is considered separately from the third, this court reiterates what it stated above:

It should be emphasized that, in discussing the third and very similar fourth preliminary injunction factor, this court is balancing harms and considering the public interest in the context of the *preliminary injunction motion*. In the preliminary injunction context, the balance of the harms and the public interest are determined partly in terms of whether it would be better to give the courts an opportunity to consider the merits of a Rule which sharply alters the pre-existing status quo, before it goes into effect. In this vein, this court believes that CMS' position on the third and fourth preliminary injunction factor is significantly weakened by the fact that it previously declined to oppose nursing home arbitration as a matter of agency policy. As stated previously, this court does not believe that the fact that CMS changed its position in this regard renders the Rule arbitrary and capricious. This court does believe, however, that CMS' change in position weakens its argument that it has now realized that nursing home arbitration is harmful and that its new rule implementing this policy must go into effect *right now*.

Also relevant to both the third and fourth factors are the facts that, as noted previously, Congress repeatedly failed to enact proposed legislation similar in effect to the Rule, and thirty-four U.S. Senators wrote to CMS asking that it take the action it did. These facts, along with the sheer breadth of the Rule, raise concerns in this court's mind that this case involves an attempted expansion of federal agency power in such a manner as to raise separation of powers concerns. This court frankly believes that these issues are even more important than the arbitration issues, and the potential that the Rule might serve to violate the basic separation of powers in the U.S. Constitution seems a quite relevant factor in

deciding whether to allow the federal courts to resolve any concerns in this regard before allowing it to go into effect.

Particularly in light of these considerations, this court does not see evidence in the administrative record which would support a finding favorable to defendants on this factor.

In arguing that the public interest would be served by the grant of a preliminary injunction, the entirety of defendants' arguments is as follows:

> As discussed above, Congress has expressed great concern for the welfare of nursing home residents under Medicare and Medicaid, and has entrusted the Secretary of Health and Human Services with protecting them. *See* H.R. Rep. No. 100-391(I), at 448, 452; 42 §§ 1395i-3(c)(1)(A)(xi), (d)(4)(B), 1396r(c)(1)(A)(xi), (d)(4)(B). Protecting the interests of those residents is, therefore, part of the "public interest," which thus militates against the requested preliminary injunction for the same reasons stated in Part III immediately above.

> The public interest disfavors plaintiffs' motion for the additional reason that most arbitration agreements have "confidentiality clauses that prohibit both parties from discussing the dispute and what happens during the arbitration process, including the decision, with outside parties." 81 Fed. Reg. at 68,797. Such clauses limit the information available to both government representatives and the public in general. They "prohibit the resident and others from discussing any incidents with individuals outside the facility, such as surveyors and representatives of the Office of the State Long-Term Care Ombudsman." 80 Fed. Reg. at 42,211. And, as the Secretary has said, "public knowledge about a dispute and a public record of a decision are vitally important for checking the worst abuses of non-compliant LTC facilities." 81 Fed. Reg. at 68,794. In this case, therefore, the public interest arises partly out of what (legitimately) interests the public.

[Defendants' brief at 30-31].

This court frankly regards defendants' arguments on this issue as less persuasive than those set forth in their discussion of the third preliminary injunction factor, and it finds them similarly unavailing. Once again, the Rule in this case changes a practice which CMS accepted for many years, and this court does not believe that its above-stated concerns with confidentiality

clauses and generalized citations to agency discretion constitute sufficient reason to prevent the courts from making a careful evaluation of the Rule before it goes into effect. This court therefore concludes that the fourth preliminary injunction factor, like the other three, favors plaintiffs.

## Conclusion

This case places this court in the undesirable position of preliminarily enjoining a Rule which it believes to be based upon sound public policy. As discussed in section I of this order, this court believes that nursing home arbitration litigation suffers from fundamental defects originating in the mental competency issue, rendering it an inefficient and wasteful form of litigation. This court believes that Congress might reasonably consider this inefficiency, as well as the extreme stress many nursing home residents and their families are under during the admissions process, as sufficient reason to decide that arbitration and the nursing home admissions process do not belong together. Nevertheless, Congress did not enact the Rule in this case; a federal agency did, and therein lies the rub. As sympathetic as this court may be to the public policy considerations which motivated the Rule, it is unwilling to play a role in countenancing the incremental "creep" of federal agency authority beyond that envisioned by the U.S. Constitution. While this court does not exclude the possibility that CMS could, in the future, make a sufficiently strong showing that it had the authority to enact the Rule it did, it seems unlikely, based on the administrative record in this case, that it will be held to have done so here. Moreover, given that the enactment of the Rule raises serious legal questions extending well beyond the arbitration issue, this court concludes that the balance of harms and the public interest support holding it in abeyance until the doubts regarding its legality can be definitively

resolved by the courts.

It is therefore ordered that the motion for preliminary injunction is granted.

So ordered, this the 7th day of November, 2016.

/s/ Michael P. Mills
U.S. DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI